David DeVOTO and Charles F. Volk,
Plaintiffs-Appellees,

v.

PACIFIC FIDELITY LIFE INSURANCE COMPANY and Bankers Mortgage Company of Calif., Defendants-Appellants.

No. 76–2303.

United States Court of Appeals, Ninth Circuit.

April 9, 1980.

Jack B. Owens, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., argued, for defendants-appellants.

Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., for plaintiffs-appellees.

Before TRASK and KENNEDY, Circuit Judges, and TURRENTINE,* District Judge.

KENNEDY, Circuit Judge:

This is an appeal from a judgment for damages entered against the defendants (appellants here) on two separate claims, each presenting significant questions for our decision. The first claim was based on section 1 of the Sherman Act. 15 U.S.C. § 1 (1976). The second, arising out of the same transaction, alleged a pendent state claim for tortious interference with prospective business advantage. The appeal as to that aspect of the case raises an interesting question, apparently one of first impression under California law, concerning essential elements in the definition of the tort. We previously reversed a summary judgment of dismissal granted in favor of the defendants on the antitrust claim. *DeVoto v. Pacific Fidelity Life Ins. Co.*, 516 F.2d 1 (9th Cir.), *cert. denied*, 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975) (*DeVoto I*). After a trial on remand the jury returned verdicts for the plaintiffs on both claims with damages (before trebling on the antitrust count) of $109,375.[1] In this court the defendants challenge the judgment on each claim. The facts are set out in greater detail in *DeVoto I*. Briefly, the situation is as follows: Pacific Fidelity Life Insurance Company (Pacific) and American Home Assurance Company of New York (American) are two companies which, among other business activities, sell mortgage protection insurance to mortgagors to effect payment of the mortgage in the event of the death or disability of the mortgagor. Bankers Mortgage Company of California (Bankers) is in the business of making real estate loans in California and Nevada. Bankers and Pacific are both subsidiaries of the Transamerica Corporation, but Bankers initially entered into a contract with American. By the terms of the agreement, Bankers provided American with a list of mortgagors' names and received a fee for the names supplied, in addition to a commission for each policy sold. Pacific persuaded Bankers to abrogate the contract with American and to enter into an arrangement with Pacific instead. American is not a party to this action; rather, the suit was brought by two individuals, appellees here and plaintiffs below, who were responsible for bringing Bankers and American together and who expected agents' commissions from any income American earned from its contract with Bankers. Plaintiffs contend that Bankers' decision to abrogate the American contract was based on the corporate relationship between Bankers and Pacific, and resulted from pressure to keep the business of mortgage protection insurance within the Transamerica family.

*Antitrust Claim*

In *DeVoto I*, we determined that plaintiffs had standing and that their allegations were sufficient to state a claim for relief;[2] we must now determine whether the evidence adduced at trial was sufficient to carry plaintiffs' burden of proof. We conclude that it was not.

■ At the outset, it must be said that the defendants' actions are to be judged by the rule of reason, not by a per se rule.

---

* Honorable Howard B. Turrentine, United States District Judge for the Southern District of California, sitting by designation.

1. The jury found damages in the amount of $125,000 but reduced the figure by one-eighth because a party holding a one-eighth interest in plaintiffs' business had not sued.

2. Our holding that Sherman Act liability was not established makes it unnecessary to examine whether the *DeVoto I* holding—that brokers may bring the antitrust claim—survives the intervening decisions by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977). The cited, more recent cases are consistent with our conclusion that brokers may not recover on the state law tort claim on these facts. Even if our analysis in *DeVoto I* were not consistent with our discussion of the California law, issues of antitrust and tort standing are not necessarily so isomorphous that each analysis may not stand on its own.

Even assuming that the package offered by American was more desirable than Pacific's and that Bankers cancelled Pacific's contract solely for the purpose of keeping the business in the Transamerica family, that does not constitute a per se violation of the antitrust laws. We think this point was established by our opinion in *DeVoto I.* The court noted there that the corporate relationship between Bankers and Pacific "when allowed to intrude into the free marketplace, *may produce* an anticompetitive effect such as the antitrust laws were designed to combat." 516 F.2d at 6 (footnote omitted) (emphasis added). The court went on to hold that "[a]n *issue of fact* is presented as to whether in breach of the American contract, the defendants intended to, or did, *unreasonably* restrain trade ,in violation of § 1 of the Sherman Act." *Id.* at 6–7 (emphasis added).

 Moreover, we do not believe a per se rule is appropriate in this type of case. The court has warned that "additions to the limited per se list are not to be made on an ad hoc basis. At least they are not to be made without evidence supporting a determination that the restraint is such as to have a pernicious effect on competition." · *Gough v. Rossmoor Corp.*, 585 F.2d 381, 388 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). There are not sufficient grounds to conclude that business decisions based on favoring corporate affiliations automatically must be condemned. *See White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). We believe that such decisions may not be wholly without justification in some cases. Particularly in long term relationships, there may be economies in dealing with friends because there is a greater likelihood of amicable resolution of disagreements. The Supreme Court has noted, in the context of mergers, that a corporate subsidiary will in all probability deal only with its affiliate for goods the affiliate can furnish, but that fact alone does not make an acquisition invalid. *United States v. Columbia Steel*

*Co.*, 334 U.S. 495, 523, 68 S.Ct. 1107, 1122, 92 L.Ed. 1533 (1948). We are not prepared to expand the very limited list of per se offenses to include the conduct at issue in this case.

Of course, if such arrangements are not always injurious neither are they wholly commendable because, as *DeVoto I* points out, they introduce an "irrelevant and alien factor" into the free marketplace which may have anticompetitive effects. Upon those grounds we remanded for a factual inquiry into whether the practice was in this case unreasonable.

 Turning now to a rule of reason analysis, we must determine whether the plaintiffs below carried their burden of proof. A crucial aspect of a plaintiff's case under the rule of reason is a demonstration that the alleged conduct of the defendant had some market impact. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 883–84, 97 L.Ed. 1277 (1953); *Associated Press v. United States*, 326 U.S. 1, 27, 65 S.Ct. 1416, 1428, 89 L.Ed. 2013 (1945) (Frankfurter, J., concurring); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1247 (3d Cir. 1975). As this court recently stated, "Unless the alleged anticompetitive conduct is per se unreasonable, the fact that the conduct restrained trade in a relevant market is an essential part of a plaintiff's case . . . and the burden of establishing it lies on him." *Gough v. Rossmoor Corp.*, 585 F.2d 381, 385 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). This court and others have repeatedly emphasized that "[t]he antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoted in *Gough, supra*, 585 F.2d at 386) (emphasis in original) (citation omitted), and therefore the plaintiff must show something more than simply an adverse effect on his own business; he must show "an adverse impact on the competitive conditions in general as they exist within

the field of commerce in which the plaintiff is engaged." *Gough, supra,* 585 F.2d at 386. Absent per se violation, competitive injuries must be defined in terms of a discrete market. The parties stipulated at trial that the relevant market for purposes of this case is the market for the sale of mortgage protection insurance in California, which consists of all residential mortgagors in the State of California whose loans are serviced by mortgage bankers, savings and loan associations or commercial banks. Thus the question narrows to the nature and extent of anti-competitive practices in the market for the sale of mortgage protection insurance in California and whether or not such practices, in that market, were unreasonable.

The Supreme Court has stated that the appropriate focus in determining reasonableness under section 1 focuses on "the percentage of business controlled, the strength of the remaining competition, [and] whether the action springs from business requirements or purpose to monopolize." *United States v. Columbia Steel Co.,* 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) (quoted in *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277 (1953)). The parties stipulated that for the years in question the number of such residential mortgagors averaged in excess of 2,750,000, with an average outstanding principal balance of in excess of $50 billion and that Bankers' share of this market for this period averaged about 32,000 mortgagors with a remaining principal balance of slightly in excess of $500 million. This means that the percentage of the relevant market affected by defendants' actions was slightly more than 1%. We have not found any cases in which an impact on this small a percentage of the relevant market was held to be unreasonable nor have plaintiffs cited any to us. *See* 16 J. Von Kalinowski, Business Organizations § 6.02[4] at 6–141 (1969).

On the facts of this case, moreover, it is not even clear that there has been an adverse effect on the 1% of the market in question. The only market effect about which there was any evidence concerns the quality of the product offered to consum-

ers; plaintiffs allege that the insurance policy which Pacific offered was less desirable than American's. Even assuming the allegation to be true, however, Bankers' mortgagors were not required to buy Pacific's or any other mortgage insurance. If American offered a better insurance policy, consumers were free to buy it. The most that can be said for the actions of defendants is that they reduced the likelihood that consumers would learn of the allegedly better policy. *See Gough, supra,* 585 F.2d at 387 n.8.

■ Plaintiffs apparently contend that despite the very small percentage impact on the relevant market, a violation of the rule of reason can be demonstrated merely by reference to the dollar volume of commerce affected by the alleged restraint. Plaintiffs note that Bankers had about 32,000 individual mortgagors with outstanding principal balances exceeding $500,000,000 in total. They contend that plaintiffs intended to exclude American from this market and that showing this exclusion is sufficient to carry the burden of demonstrating injury. To the extent this argument is an attempt to redefine the relevant market, it is precluded by the parties' stipulation. *See American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1244 (3d Cir. 1975). Reliance on the absolute volume of commerce affected appears, moreover, to be misplaced.

■ The Supreme Court, in applying the rule of reason to mergers, has held that "[i]n determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance." *United States v. Columbia Steel Co.,* 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). Plaintiffs nonetheless attempt to rely on the dollar volume of commerce affected as dispositive by characterizing the actions at issue in this case as a form of reciprocal dealing. *See FTC v. Consolidated Foods Corp.,* 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965). One court has suggested in dictum that a reciprocity agreement covering a substantial volume of

commerce would be unlawful without regard to the percentage of the market involved. *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 66–67 (S.D.N.Y.1966); *see* L. Sullivan, Handbook of the Law of Antitrust § 171 at 494 (1977). Whatever the proper line of analysis in reciprocity cases, it is not applicable to the facts shown in this case.

Bankers is essentially selling a list of names of its mortgagors; Pacific and American both tried to buy the list and Bankers ultimately sold to Pacific. The concern with respect to reciprocity is that a firm with power in one market as a seller will exercise that power to gain an advantage as a buyer in a different market. This is very similar to the concern with tying arrangements. *See* L. Sullivan, *supra*, § 170 at 491. In the case at hand there is absolutely no evidence that the deal between Bankers and Pacific was made with any expectation or intention that Bankers would gain an advantage as a buyer of a product supplied by Pacific. As Professor Sullivan notes, "the need is not merely to find agreement, but to find a purchase made with reciprocal motive." *Id.* § 171 at 494. There was a failure to prove that the acts of defendants were part of a plan to encourage reciprocal dealing that resulted in a competitive injury, *cf. FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), or any analogous form of prohibited restraint.

■ In their attempt to demonstrate market impact, plaintiffs argue that *DeVoto I* is a conclusive decision that there was a significant adverse market effect. They point to the conclusion in *DeVoto I* that plaintiffs had met the jurisdictional requirement that the "acts complained of occur within the flow of, or substantially affect interstate commerce." *DeVoto I, supra*, 516 F.2d at 4. The jurisdictional issue is distinct, however, from the substantive issue of whether a given defendant's conduct was an unreasonable restraint of trade under the Sherman Act. *Gough v. Rossmoor Corp.*, 487 F.2d 373, 376 (9th Cir. 1973); *Cartrade, Inc. v. Ford Dealers Advertising Ass'n*, 446 F.2d 289, 292 (9th Cir. 1971).

■ Plaintiffs failed to introduce any evidence to support a finding that there was an adverse effect on the relevant market. They have not shown that viewing the relevant market as a whole there was any effect on the price, quality or quantity of mortgage insurance, nor have they shown that there have been any effects on the structure of the market which might adversely affect the climate for competition. *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21, 97 S.Ct. 2549, 2559, 53 L.Ed.2d 568 (1977). This court's observation in *Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.*, 553 F.2d 620, 627 (9th Cir. 1977) is equally applicable to the case at hand: "Appellants point to the alleged injury to their businesses, but fail to provide any evidence that the 'effect upon competition in the marketplace is substantially adverse'" (citation omitted).

■ Plaintiffs suggest that if Bankers' decision were based solely on corporate affiliation that is the equivalent of an intent to impose an unreasonable restraint on trade and no more need be shown. Plaintiffs apparently rely on the statement in *United States v. Columbia Steel Co.*, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948), that "[a] restraint may be unreasonable . . . [when] a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint." In this case, the only intent to which plaintiffs point is the defendants' intent to give preference to an affiliated company. There is no allegation or evidence that defendants' conduct was intended to fix prices, drive a competitor out of business or otherwise affect the market in question. As discussed earlier, giving preference to an affiliate sometimes causes a forbidden restraint and sometimes does not. This is not a case where the defendant intended a result beyond what was actually achieved; defendants intended exactly the result which occurred, and we have held that the result which occurred was not an unreasonable restraint of trade. The result was not unreasonable, and it follows that

an intent to achieve that result, without more, is not unreasonable. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248 (3d Cir. 1975).

### State Tort Claim

■ Independently of the antitrust claims, the plaintiffs below sought relief upon a second theory, alleging tortious interference with their prospective business advantage.[3] They claimed commissions would have been paid to them as brokers for negotiation of the Bankers-American agreement and that the commissions were a business advantage lost as a result of Pacific's inducing Bankers to repudiate the contract.

Bankers and Pacific defend by saying the inducement of the breach was done without any intent to cause injury to the brokers. The argument is not quite precise, for it should be phrased in terms of motive or specific purpose, not simply intent. When stated in this manner, we find the contention has merit, and we rule that plaintiffs' judgment for tortious interference must be reversed because there was no evidence of any motive or purpose to injure them.[4]

Tort law ordinarily imputes to an actor the intention to cause the natural and probable consequences of his conduct. *See* Restatement (Second) of Torts § 8A (1965). If the case turned on the issue of defendants' intent in this sense of the term, we would say the trier of fact could find that the defendants had the necessary state of mind to harm the brokers, for they were aware of the brokers' business relation and knew its disruption was substantially certain to follow once the principal contract with American was abrogated.

■ Tortious interference requires a state of mind and a purpose more culpable than "intent" under the Restatement definition, however. The fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability. Inquiry into the motive or purpose of the actor is necessary. The inducement of a breach, therefore, does not always vest third or incidental persons with a tort action against the one who interfered. Where the actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstances, it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly. The extent of liability, for this tort, is fixed in part by the motive or purpose of the actor. *See* Restatement (Second) of Torts § 766 & Comment j and § 767 & Comment d (1979).

We note at the outset a scarcity of pertinent authority on this issue. Although we do not find controlling precedent in California case law, or closely similar cases in other jurisdictions, we are confident the result we reach is consistent with the law California courts would announce if the issue were presented to them. Analysis of purpose and motive in the tort of business interference is not well developed in the

---

3. The district court instructed the jury as follows:

> There are no hard and fast rules governing whether or not a person is privileged to interfere with the contractual or business relations of another. In general, however, whether an intentional interference is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of defendants' conduct and the relationship between the parties. The burden of proof is on the defendants to establish a justification that there be [*sic*]. .

Reporter's Transcript at 1338.

4. Most of appellants' arguments on the pendent state claim rely on assertion of privileges. These arguments are wholly without merit: appellants cite no case in which privileged competition involved inducing a breach of contract (as here, the contract between Bankers and American) or in which an affiliation such as that between Bankers and Pacific gave rise to a privilege. *See generally Buckaloo v. Johnson*, 14 Cal.3d 815, 828, 122 Cal.Rptr. 745, 537 P.2d 865 (1975); *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 36, 112 P.2d 631 (1941); *Winn v. McCulloch Corp.*, 60 Cal.App.3d 663, 673, 131 Cal.Rptr. 597 (1976); *Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal.App.3d 879, 882, 103 Cal. Rptr. 419 (1972).

case law, but a survey of the authorities in California and other jurisdictions illustrates the specific kinds of wrong the tort is intended to redress and clarifies why the defendants' actions in this case are not tortious as to these plaintiffs.

The simplest case for allowing recovery is when there is an intended wrongful economic appropriation, as when the act of a defendant directly diminishes the value of the plaintiff's interest and simultaneously or subsequently transfers that value to the defendant. Thus a competitor may be liable for commission of the tort if he intentionally interferes with a contract to which he is a stranger for the otherwise legitimate purpose of improving his competitive position at the expense of the plaintiffs. *See Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 112 P.2d 631 (1941). An example of such tortious interference occurred in this case when Pacific induced the breach of the principal contract in order to transfer American's competitive advantage to itself, and we assume such conduct would be actionable in a suit by American.

The wrongful appropriation may be by means other than interference with a formal contractual relation or a prospective business advantage. An example of such tortious interference, by a direct means of appropriation, is when two parties in a transaction cut out an agent or middleman and implicitly split between them the value of the lost commission. *See Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 537 P.2d 865 (1975); *Herron v. State Farm Mutual Ins. Co.*, 56 Cal.2d 202, 14 Cal.Rptr. 294, 63 P.2d 310 (1961); *Siciliano v. Fireman's Fund Ins. Co.*, 62 Cal.App.3d 745, 133 Cal.Rptr. 376 (1976). In these cases defendant has a motive to secure the business advantage which formerly belonged to the plaintiffs, and that motive is an essential part of the finding that the means of the appropriation is unjust. By contrast, where a contract has been abrogated, competitors may thereafter offer to deal with the party

who repudiated the contract without incurring liability in tort: there is no act of inducement, and once the contract is abrogated there is no advantage to appropriate. *See Imperial Ice Co. v. Rossier, supra*, 18 Cal.2d at 38–39, 112 P.2d at 634; Restatement (Second) of Torts § 766, Comments h, n (1979).

There are also cases where tortious interference is accomplished by a more indirect means. For instance, where the defendant acquired a business after depressing its value by telling prospective purchasers the defendant's contract with the business would not be renewed, the statements were held tortious in a suit brought by the company. *Lowell v. Mother's Cake and Cookie Co.*, 79 Cal.App.3d 13, 144 Cal.Rptr. 664 (1978). The court justified its finding of improper interference in terms of the defendant's motive or purpose. "[I]t is underscored that the cases involving interference with prospective business advantage 'have turned almost entirely upon the *defendant's motive or purpose.*'" (emphasis in original) (citation omitted). *Id.*, 79 Cal.App.3d at 18, 144 Cal.Rptr. at 668. Motive and purpose are also central to the concept that interference inspired by ill will or spite may be tortious. *See* Restatement (Second) of Torts § 766, Comments r, s (1979).

 In all these instances of contractual or business interference, some identifiable benefit accrues to the defendant which formerly belonged to the plaintiff, be it pecuniary or competitive.[5] The defendant's spiteful satisfaction of an earlier grievance against the plaintiff would be a similar injury. It is the intentional attainment of an unjust advantage which underlies the requirement that the interference be improper, Restatement (Second) of Torts § 767 (1979), and motive or purpose is usually an accurate measure of the advantage the actor sought and of its just or unjust character.

 In the instant case no purpose to injure the plaintiffs was demonstrated.

---

**5.** This idea may also be expressed in other terms: whether or not the plaintiff has, as against defendant, a "property" right in the

invaded interest, *see* Note, *Interference With Contractual Relations: A Property Limitation*, 18 Stan.L.Rev. 1406 (1966).

The business relation between the brokers and American was of no concern to the defendants. Commissions anticipated by the broker did not, in any degree, motivate the defendants' interference with the contract between Bankers and American. The object of the interference was the principal contract, not the brokers' arrangement incidental to it. The brokers and their commissions were entirely unrelated to any motivation of the defendants, and it was not the goal or design of the interference to acquire the value of the commission. Absent a motive or purpose to injure the plaintiffs, or to appropriate an economic advantage belonging to them, or some other aggravating circumstances, the acts of Bankers or Pacific were not tortious as to the plaintiffs. The plaintiffs failed to establish these essential elements.

We have identified one class of cases in which recovery appears to have been allowed even though there is no improper purpose or advantage-taking by the defendant in relation to an interest owned or protected by the plaintiff. These involve a prospective purchaser who has asked a broker to negotiate the sale of property to him on specified terms, the broker's commission to be paid by the vendor. The purchaser in these circumstances has been held liable for tortious interference with the contract or relation between the vendor and the broker when he decides at the last minute not to buy the property, even when this contract breach is based upon an understandable reason, such as financial difficulty. The following cases comprise the evolution of this somewhat obscure line of authority: *Buono Sales, Inc. v. Chrysler Motors Corp.*, 363 F.2d 43, 49 (3d Cir.) (en banc), *cert. denied*, 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.435 (1966); *Ellsworth Dobbs, Inc. v. Johnson*, 50 N.J. 528, 236 A.2d 843, 859–61 (1967); *Tanner Associates, Inc. v. Ciraldo*, 58 N.J.Super. 398, 156 A.2d 289, 290 (1959), *rev'd*, 33 N.J. 51, 161 A.2d 725 (1960); *McKnight v. McGuire*, 117 Misc.Rep. 306, 191 N.Y.S. 323 (Sup.Ct. 1921) (Lehman, J.); *James v. Home of the Sons and Daughters of Israel*, 153 N.Y.S. 169 (Sup.Ct. 1915); *Livermore v. Crane*, 26 Wash. 529, 67 P. 221 (1901). In these instances, however, there has been a prior relation between the plaintiff and the defendant leading the former to rely upon the latter, and we think recovery is explained as easily by contract as by tortious interference, although concededly it is the latter ground which is the explicit rationale given in the opinions.[6] In the case before us there was no subsisting economic or business relation between the brokers on the one hand, and Bankers or Pacific on the other, except to the extent that the brokers became acquainted with Bankers through the negotiation, a circumstance which does not suffice for the imposition of liability.

Our opinion is not affected by the California Supreme Court's recent decision in *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979).[7] *J'Aire* considered the allegations necessary to state a cause of action for negligent interference with prospective economic advantage, rather than intentional interference, as here.[8]

---

**6.** This reliance exception is close to the facts of the *J'Aire* case, discussed below.

**7.** *J'Aire* impliedly disapproves the decision of this court in *Standard Oil Co. v. United States*, 153 F.2d 958 (9th Cir. 1946), *aff'd*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947).

**8.** The court in *J'Aire* explained its holding by listing six criteria:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

24 Cal.3d at 804, 157 Cal.Rptr. at 410, 598 P.2d at 63. Whether these criteria are requisite elements of a cause of action, or merely considerations to be blended from case to case, was not decided by the court, but we assume the latter. Although the scope of the California court's expansion of the tort of negligent interference is as yet unclear, we note that so far it has only been applied in a case that is roughly similar to third party beneficiary cases. *See also Heyer v. Flaig*, 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969); *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961); *Biakanja v. Irving*, 49 Cal.2d 674, 320 P.2d 16 (1958).

Negligent interference was not pleaded here, but our responsibility to decide the instant case under California law requires, we think, an inquiry whether the *J'Aire* decision implies that the California Supreme Court would alter the current definition of the intentional tort to permit recovery for DeVoto and Volk. We conclude that it would not.

Our conclusion rests on the difference between the purpose of an intentional interference cause of action and the purpose of the cause of action established by *J'Aire*. The former cause of action tends to restrain impermissible behavior in the marketplace between competitors: it sets forth the ground rules of competition to confine business rivalry within acceptable bounds of conduct. W. Prosser, Handbook of the Law of Torts 952–62 (4th ed. 1971).

Two different considerations animate the California Supreme Court's *J'Aire* decision; both concerns are for the purpose of preventing rigid categories of the injured party's status or the nature of his injury from obscuring the more fundamental inquiry into the scope of an actor's legally foreseeable impact and thus liability. Specifically, the California court's opinion emphasizes that one may assume obligations by a contract that is in turn motivated in part by the promisee's desire to benefit third parties and in which contract third parties are thereby interested, and for the unsatisfactory performance of which they may recover. The court also showed concern lest an injury due to negligence go unredressed simply because an intangible economic interest rather than a tangible one was injured. When the wrongful act is the same, the ability to recover should not hang on the fortuity of whether the injury is to the physical assets of a business rather than to its good will.[9] The fundamental inquiry is of course different in the case of intentional torts. Foreseeability is not at issue because it is not a requisite to recovery. Since all consequences, no matter how remote, harming a party with a cause of action for an intentional tort give rise to defendant's liability, the inquiry focuses on the inherent and relational quality of the wrongful act rather than on the foreseeability of its consequences. *See* 4 B. Witkin, Summary of California Law § 9, at 2309 (8th ed. 1974); Epstein, *Intentional Harms*, 4 J. Legal Stud. 391 (1975), Note, *The Tie That Binds: Liability of Intentional Tort-Feasors for Extended Consequences*, 14 Stan.L.Rev. 362, 367 (1962) (suggesting liability-limiting principles in intentional torts deficient by comparison with negligent torts, where foreseeability provides limiting principle).

This brief discussion of two significantly different causes of action suggests why different principles have come to govern different kinds of wrongful acts even though these acts may incidentally produce similar effects. For the foregoing reasons we do not interpret the California Supreme Court in *J'Aire* to have undone, by silent implication, the established case law on intentional interference with economic advantage by its decision in the separate area of negligent interference.

Even if we were to assume that something like the six criteria of *J'Aire* would replace the definition of the intentional tort as we have outlined it above, we do not think that the brokers would be entitled to recover. The nature of the brokers' business risks and the speculative quality of damages from lost commissions—to be calculated on the basis of the volume of sales that never occurred—are two factors specifically enumerated by the California court as precluding recovery. *See J'Aire, supra*, 24 Cal.3d at 808, 157 Cal.Rptr. at 412–13, 598 P.2d at 65–66.[10]

---

9. This conforms with the broad language of California's negligence principle, *see* Cal.Civ. Code § 1714(a) (West 1973); *Rowland v. Christian*, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968); 4 B. Witkin, Summary of California Law § 391A, at 98–101 (Supp.1978).

10. *I. e.*, the plaintiffs here were more remotely related to the principal transaction—between Bankers and American—than were the plaintiffs in *J'Aire*, which relates to criteria (1) and (4), *see* note 8 *supra*, and the moral and public policy considerations, as well as the certainty of the damages suffered, are weaker here than in *J'Aire*, which relates to criteria (3), (5), and (6). *See* note 8 *supra*.

The facts of the case before us, examined in the light of our analysis of the tort of interference with business advantage, lead us to conclude that the defendants have no liability to the plaintiffs and that the judgment entered for the plaintiffs must be reversed.

The defendants have argued additional grounds for reversal of the judgment, matters which turn on the applicability of the statute of limitations and on the trial court's evidentiary rulings admitting certain testimony on the issue of damages. In our view the plaintiffs have not countered these contentions with convincing reasons, but it is unnecessary for us to address them in view of our holding on the primary issue of tortious liability.

Each party shall bear its own costs on this appeal.

REVERSED.