**Jerome CANADY, M.D., Plaintiff,**

v.

**PROVIDENCE HOSPITAL,
et al., Defendants.**

**Civ. Action No. 95–0580 (JR).**

United States District Court,
District of Columbia.

Oct. 2, 1996.

Fred E. Cowden, Jr., Nashville, TN, Sean W. O'Connell, Arlington, VA, for Plaintiff.

George T. Tyler, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for Defendants.

## MEMORANDUM

ROBERTSON, District Judge.

After trial on July 22–24, 1996, and after considering the objections and suggested amendments of the parties to the Court's tentative findings of fact and conclusions of law, the Court makes the following findings of fact and conclusions of law:

1. In September 1992, Jerome Canady, M.D., applied for a staff appointment at Providence Hospital in the District of Columbia. He was then chief surgical resident at McKeesport Hospital in Pennsylvania and was anticipating a return to Washington at the completion of his residency in June 1993. As part of his application, Dr. Canady filled out a form provided by the Providence Hospital department of surgery called a "privilege control list," checking off, by their medical names, the surgical procedures for which he wanted privileges.

2. In April 1993, Dr. Canady met with Dr. Robert Simmons, vice president for medical affairs at Providence. In that initial meeting Dr. Canady told Dr. Simmons that

he wanted to perform vascular and thoracic surgery as well as general surgery at Providence. The following month, Dr. Canady met with Dr. Frank Sanzaro, chairman of the department of surgery. He told Dr. Sanzaro that, in addition to general surgery, he wanted to perform vascular, thoracic, gynecological, and endoscopic procedures. Dr. Sanzaro responded that there was "no way" Dr. Canady would qualify for gynecology privileges; that he should "submit cases, documented" for endoscopic privileges; and that his request for vascular and thoracic privileges would be reviewed by Dr. Simmons.

3. In June 1993, Dr. Canady was interviewed by Dr. Simmons. At this interview, Dr. Canady indicated that he was seeking privileges in general surgery, vascular surgery, thoracic surgery and endoscopic surgery, and he further indicated a strong interest in doing advanced laparoscopic procedures. Dr. Canady recalls that Dr. Simmons told him to "send in his numbers." Dr. Simmons recalls suggesting to Dr. Canady that he send in "his cases," including numbers, procedures, indications, results, and other details. After his meetings with Dr. Sanzaro and Dr. Simmons, Dr. Canady submitted a form listing his "operative experience," during the period June 1984 until June 1993. That report, which Dr. Canady maintained for the American Board of Surgery, showed the numbers of each surgical procedure he had attended or performed as first assistant, teaching assistant, surgeon in junior years of residency, and surgeon in chief year of residency. Dr. Canady submitted no additional information about his surgical experience.

4. By letter of October 25, 1993 from Sister Carol Keehan, president of Providence Hospital, Dr. Canady was informed of his provisional appointment to the Providence department of surgery. The appointment letter was silent as to privileges. When Dr. Canady asked Sister Carol what privileges he had been granted, she said, "As far as I know you got everything you applied for."

5. Dr. Canady considered his first operation at Providence a success, but he became upset by what he viewed as inadequacies in the intensive care unit and arranged for his patient's transfer to Howard University, where she died. After this event, Dr. Canady filed a patient incident report, and the Providence nursing supervisor filed a complaint of disruptive behavior by Dr. Canady and raised patient care issues. There followed a meeting among Drs. Simmons, Sanzaro, Canady and others on November 16, 1993. The purpose of the meeting was to "clarify impediments to integrated patient care at Providence by review of a patient incident report." Three days after that meeting, Dr. Sanzaro placed a handwritten note in Dr. Canady's hospital credentials file. The note read, "No thoracic. No vascular. No GYN. No urology. No general laparoscopic surgery other than lap choli."

6. In early February 1994, Dr. Simmons learned, from a surgeon who had provided a second opinion in a case Dr. Canady had scheduled for surgery, that the other surgeon believed the case would require thoracic surgery. He informed Dr. Canady, by a letter sent Federal Express, that Providence would not schedule that patient with Dr. Canady as the primary surgeon. In the same letter, Dr. Simmons noted that Dr. Canady had scheduled another patient for a vascular procedure for which Dr. Canady did not have privileges. Dr. Canady testified that this letter, dated February 10, 1994, was his first notice that he had not been given thoracic privileges. He also testified that in January 1994 he had reviewed his credentials file and learned that he had not been given thoracic or vascular privileges.

7. In April 1994, Dr. Canady retained counsel and pressed the hospital on the subject of his privileges. In a letter dated April 22, 1994, counsel asserted that, although Dr. Canady had been granted privileges to perform general surgery in October, he had not "received any further information since then concerning privileges to perform the other types of surgery for which he applied." The letter made a pointed reference to D.C.Code § 32–1307(f), which requires hospitals to act within 120 days on physicians' applications for privileges. The hospital's response to counsel's inquiry was delayed and bureaucratic. Providence had learned that Dr. Ca-

nady was mired in credentialing problems at Howard University and National Hospital for Orthopedics and Rehabilitation, and it was insisting that Dr. Canady provide information about his status at those other hospitals before responding to counsel's inquiry.

8. In late June 1994 Dr. Simmons placed a "hold" order on an operation Dr. Canady had scheduled at Providence, effectively suspending Dr. Canady's privileges. Dr. Canady immediately brought suit to challenge that suspension, in Superior Court for the District of Columbia. The suit was withdrawn, and Dr. Canady's privileges were reinstated, after Dr. Canady agreed to furnish a written second opinion by noon on the working day before the day of surgery "for cases under the category thyroidectomy and for all major, elective gastrointestinal cases." There were some difficulties and some misunderstandings about Dr. Canady's compliance with the agreed second opinion protocol.

9. Immediately after withdrawing the lawsuit, Dr. Canady's counsel renewed the question of whether Dr. Canady was to be given privileges in laparoscopic and vascular surgery. In response, by letter of August 18, 1994, counsel for Providence finally set forth the hospital's formal position: that, although it knew through conversation and indirectly that Dr. Canady was interested in doing vascular surgery and advanced laparoscopy, it had never received a specific application for those privileges. Dr. Canady did not respond.[1]

10. On February 20, 1995, a patient of Dr. Canady was admitted to Providence Hospital with an infected left leg and ischemic left foot. Midnight emergency surgery was scheduled, for which the operating room was specially staffed. After being told by his patient that an anesthesiologist had commented in her hearing that the leg should be amputated, and after an ensuing argument

with the anesthesiologist, however, Dr. Canady ordered the patient transferred to Howard University Hospital.

11. The February 20 incident was the triggering event for a formal request for "corrective action," which was filed by Dr. Simmons, the vice president for medical affairs. Corrective actions are provided for by the bylaws of the medical-dental staff of Providence "whenever the activities or professional conduct of any practitioner ... with clinical privileges are considered to be lower than the standards or aims of the Medical–Dental Staff or to be disruptive to the operations of the Hospital...." Article VII, § 1A. As provided by the bylaws, the chairman of the department of surgery appointed an ad hoc committee to investigate and report to the Executive Committee.

12. In compliance with Article VII, § 1C of the bylaws Dr. Canady was invited to meet with the ad hoc committee and was informed that the request for corrective action related to allegations of his inability to use the support services and the medical dental staff at Providence Hospital to facilitate the safe management of his patients, and to violations of his agreement to provide second opinions on major elective gastro-intestinal cases. Detailed minutes were kept. After the interview, the ad hoc committee concluded that the allegations were substantiated and posed a threat to patients and recommended Dr. Canady's summary suspension.[2]

13. The ad hoc committee made its recommendation to the chairman of the department of surgery and executive committee on March 7, 1995. The chief (president) of the medical staff formally advised Dr. Canady the next day that he had been summarily suspended and that, under Article VII, § 2 of the bylaws, he was entitled to request that the Executive Committee review the suspension.

---

1. Dr. Canady did submit a reapplication for privileges seven months later, after his surgical privileges were suspended in March 1995. This application specifically indicated that he was applying for class I, II, III and IV vascular procedures and for thoracic surgery. Because revocation proceedings were pending at that time, however, the hospital declined to consider the reapplication.

2. "This interview shall not constitute a hearing, shall be preliminary in nature, and none of the procedural rules provided in these Bylaws with respect to hearings shall apply thereto." Article VII, § 1C.

14. On March 15, 1995, Dr. Canady, acting through retained counsel, asked for a formal hearing in accordance with Article VIII of the bylaws. This request was treated as a waiver of Executive Committee review. At its meeting on March 23, 1995, the Executive Committee accordingly sustained the summary suspension, recommended to the Board of Directors that Dr. Canady's provisional medical staff membership and clinical privileges be revoked, and approved Dr. Canady's request to proceed directly to a formal hearing. Dr. Canady was advised of these actions by letter dated the same day.

15. A formal hearing was then held, by a duly appointed committee of eight physicians, on the record and fully transcribed, on June 8 and June 14, 1995. Dr. Canady was represented by counsel and was provided, in advance of the hearing, all of the documents that were considered by the committee.

16. On June 16, 1995, the chairman of the hearing committee reported to the executive committee its decision to uphold the recommendations of the executive committee imposing summary suspension and revoking Dr. Canady's provisional staff membership.

17. On October 23, 1995, the Board of Directors of Providence Hospital considered Dr. Canady's appeal from the adverse recommendation of the hearing committee and the executive committee and approved the decision of its special committee that Dr. Canady's suspension be affirmed and that he not be reappointed.

18. The only appearance of defendants William Funderburk, David Hunt and Norman Rogers in the facts of this case was their appointment by Dr. Sanzaro on February 24, 1995 and their service from then until March 7, 1995 as members of the ad hoc committee appointed to address the request for corrective action submitted by Dr. Simmons. The record contains no evidence of any wrongdoing on their part.

19. A meeting of physicians practicing vascular and thoracic surgery at Howard University Hospital was held at Howard in July 1993. All of the doctors present were members of the Howard staff, and the meeting was a monthly staff meeting. The meeting was called by Dr. Oswald Warner, the new chairman of Howard's department of thoracic and vascular surgery. At the meeting, questions were raised about whether Dr. Canady should have been granted privileges in vascular and thoracic surgery by Dr. Warner's predecessor. Dr. Warner took the position that Dr. Canady's privileges had been granted "hurriedly" prior to Dr. Warner's assuming the chair and that Dr. Canady did not meet the requirements. After the meeting, Dr. Warner asked Dr. Canady to withdraw his vascular and thoracic privileges voluntarily, because involuntary withdrawal by Howard would have to be reported to the National Practitioner Databank maintained by the U.S. Department of Health and Human Services. Some or all of the doctors present at the Howard meeting also had privileges at Providence Hospital. Dr. Simmons was not present at the Howard meeting. The record contains no evidence of wrongdoing on the part of anyone who attended that meeting.

20. Dr. Canady's expert on damages calculated that, from the date of his summary suspension from the Providence staff until the date of trial, Dr. Canady lost $72,000 in vascular surgery billings and $227,000 in general surgery billings. These calculations were of pre-tax dollars and included no offset for the cost of collection (about $18,000) or for any allocable portion of Dr. Canady's office overhead.

## CONCLUSIONS OF LAW

### Jurisdiction

1. The Court has jurisdiction of plaintiff's Sherman Act claims under 28 U.S.C. § 1331 and supplemental jurisdiction of plaintiff's local law claims under 28 U.S.C. § 1367(a).

### Sherman Act

2. Plaintiff's claim of violation of the Sherman Antitrust Act, sections 1 and 2 was dismissed at the close of plaintiff's case upon defendant's motion for judgment as a matter of law. Great emphasis was placed on the antitrust claim before trial. The antitrust claim was indeed the jurisdictional shoehorn used by plaintiff to lodge the case successfully in this court. Nevertheless, plaintiff made no serious effort to prove his antitrust

case. The original premise of the claim was that Dr. Simmons, who initiated the request for corrective action, had been a participant at the Howard University meeting and that the Howard meeting had been an irregular, unauthorized, conspiratorial gathering of surgeons in economic competition with Dr. Canady. None of that was proven. Dr. Simmons was not at the Howard meeting, and, except for establishing that the doctors who attended the Howard meeting were all vascular or thoracic surgeons, there was no effort to prove that any of them were in direct economic competition with any others. Nor did plaintiff attempt to prove any connection between the July 1993 meeting and any of the facts, peculiar to Providence Hospital, that were developed at the trial.

3. *Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810 (11th Cir.1990), and *Boczar v. Manatee Hospitals & Health Systems, Inc.*, 993 F.2d 1514 (11th Cir.1993), upon which plaintiff relied, were both tried as antitrust cases. They are factually distinguishable and inapposite. Here plaintiff demonstrated no effect on competition, either from the alleged denial of vascular and thoracic privileges or from the suspension of his general surgery privileges. See *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Nor did plaintiff even begin to prove the existence of an antitrust conspiracy. See *Okusami v. Psychiatric Institute of Washington, Inc.*, 959 F.2d 1062, 1064–66 (D.C.Cir. 1992); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 705 (4th Cir.1991) *(en banc)*. Nor did plaintiff prove that the defendant's possessed monopoly power or a dangerous probability of obtaining monopoly power, necessary elements of section 2 monopolization claim, see, *e.g.*, *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ 4. Related to plaintiff's Sherman Act claim, because it is a claim of economic misbehavior, is plaintiff's allegation (Third Amended Complaint ¶ 61) of a violation of D.C.Code § 32–1307(b)(6), which provides that a physician's willingness to send a cer-

tain number of patients to a particular hospital is not a valid factor for consideration in the determination of that physician's qualifications for staff membership or clinical privileges. Plaintiff did prove that Providence was upset following his transfer of two patients to Howard and a third to Georgetown, but no connection was proven—and none is or can reasonably be inferred—between the economic aspects of those decisions and the hospital's decisions to grant, withhold, suspend, or revoke Dr. Canady's privileges. It is clear from this record that the hospital's concern was with the medical appropriateness of transferring unstable patients; with the volatile, hostile and uncooperative way in which Dr. Canady dealt with the hospital staff; and with its perception that Dr. Canady was improperly transferring patients in order to escape Providence Hospital's appropriate medical oversight.

5. Upon further review of the record, plaintiff having proven no conspiracy and no effect on competition, and indeed having proven no economic motive or effect whatever of the acts of the defendants that he claims were unlawful, the dismissal at of plaintiff's Sherman Act claim, and of that portion of Count I that was premised on a violation of D.C.Code § 32–1307(b)(6), is confirmed.

*Breach of Contract Claim*

6. The claim of breach of contract asserts that the Bylaws, Rules and Regulations of the Medical–Dental Staff were contractual in nature and that the hospital's "de facto suspension, subsequent summary suspension and revocation of Dr. Canady's clinical privileges constitutes a breach of its contract with Dr. Canady." Third Amended Complaint ¶ 78.

■ 7. Plaintiff has not sustained his burden of establishing that he made a completed application for thoracic or vascular or advanced laparoscopic privileges. His written application specified the privileges he was seeking only by checking off boxes on the privilege control list. Neither the boxes he checked nor the procedures he named in the blanks labeled "other" were thoracic, vascular or advanced laparoscopic surgical proce-

dures. The written record of the hospital's action on this application was approval of Dr. Canady for general surgery and a note that he would "submit documented cases—thoracic and vascular surgery." Plaintiff's oral statements to Drs. Sanzaro and Simmons that he would like to do thoracic, vascular and advanced laparoscopic procedures and his submission of an operative experience form showing only the numbers of named procedures he had done, did not amount to a completed application that Providence Hospital was obliged either to grant or deny—especially in view of Article VI, § 1(B) of the bylaws, which plainly provides that "the burden of establishing qualifications [for clinical privileges] shall be on the applicant."

■ 8. Plaintiff's counsel advanced the specific argument at trial that the bylaws required notice to Dr. Canady by registered mail, return receipt requested, that his request for clinical privileges had been denied. His reference apparently was to Article V, § 2(E) of the bylaws, dealing with procedures for appointment and reappointment:

> "when the recommendation of the Executive Committee is adverse to the practitioner ... either in respect to appointment or to clinical privileges, the President shall promptly notify the practitioner or allied health professional of such adverse recommendation by certified mail, return receipt requested."

Because plaintiff did not make a completed application, however, Providence Hospital did not make a decision adverse to the practitioner within the meaning of Article V, § 2(E). Accordingly, it had no obligation to notify Dr. Canady by certified mail, return receipt requested.

■ 9. The above conclusions also dispose of plaintiff's claim of a violation of D.C.Code § 32–1307(f), which provides

> "whenever a health professional submits a *completed* application for staff membership or clinical privileges to a facility or agency, that facility or agency shall have 120 calendar days to grant or deny the application." (emphasis added.)

Dr. Canady did not submit a completed application for thoracic surgery, vascular surgery or advanced laparoscopic surgery. Thus, even if D.C.Code § 32–1307(f) gives rise to an action for damages, plaintiff cannot bring himself within its protections by the loose and informal way in which he prosecuted his application for privileges at Providence Hospital.

*Tortious Interference*

10. At trial, both sides focused upon the question whether the actions of Dr. Simmons, in requesting the corrective action that led to Dr. Canady's suspension, and of the hospital, in carrying out the suspension and revocation process, were privileged by the hospital's bylaws and by the peer review process, such that they were immune from tort liability for their actions. Before addressing privilege and immunity, however, it is worth considering whether the elements of the tort were established.

■ 11. *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 289 (D.C.App.1977) holds that, in order to establish a right to relief under the rubric of tortious interference with business opportunities and economic gain in the District of Columbia, a plaintiff must show that the interference was intentional and that there was resulting damage. In *Genetic Systems Corp. v. Abbott Labs.,* 691 F.Supp. 407, 423 (D.D.C.1988), Judge Joyce Hens Green adopted the New York law set forth in *Nifty Foods Corp. v. The Great Atlantic and Pacific Tea Co., Inc.,* 614 F.2d 832, 838 (2d Cir. 1980), and held that there could not be tortious interference in the absence of evidence that the sole motive of the defendant was to inflict injury or that the defendant had used unlawful means. In *Weiss v. Lehman,* 713 F.Supp. 489, 503 (D.D.C.1989), citing *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 485 A.2d 663, 675 (1984); Restatement (2d) of Torts, §§ 766B and 767, Judge Sporkin applied Maryland law in listing the elements of a claim of interference with prospective economic advantage:

> "(1) Intentional and willful acts:
>
> (2) Calculated to cause damage to [plaintiff] in [his] lawful business;
>
> (3) Done with the unlawful purpose to cause such damage or loss, without right

or justifiable cause on the part of [defendant], (which constitutes malice); and

(4) Actual damage and loss resulting."

In *Ellsworth Associates v. United States,* 917 F.Supp. 841 (D.D.C.1996), Judge Richey, following Judge Green's decision in *Genetic Systems Corp., supra,* observed that the law of tortious interference with business is the same (or produced the same results on the facts before him) in Maryland, Virginia, and the District of Columbia. The elements set forth in Judge Green's decision are quoted with approval in Judge Sentelle's dissent in *Okusami v. Psychiatric Institute of Washington,* 959 F.2d 1062, 1069 (D.C.Cir.1992).

12. Restatement of Torts 2d (1979) provides for liability for interference with prospective contractual relations if the act of interference is "intentional and improper," § 766B. Seven factors are listed for determining whether the actor's intentional conduct is improper or not, § 767: the nature of the actor's conduct, his motive, the interests of the one interfered with, the interests sought to be advanced by the actor, the interest of society in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the conduct complained of to the interference, and the relations between the parties. In contrast to the two-element test (intent and damages) set forth in the *Altimont* case, *supra,* it is generally held that tortious interference with prospective business advantage "requires a state of mind and a purpose more culpable than 'intent' under the Restatement definition [§ 8A].... The fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability. Inquiry into the motive or purpose of the actor is necessary." *DeVoto v. Pacific Fid. Life Ins. Co.,* 618 F.2d 1340, 1347 (9th Cir.1980).

13. The most applicable—and controlling—case law in this jurisdiction is *Okusami v. Psychiatric Institute of Washington, supra.* The majority opinion in the *Okusami* case did not include a separate element of improper intent in its formulation of the tort. Instead Judge Williams found a claim of tortious interference, in a case involving a physician's business relationship with his patients, to have been adequately pleaded by the barebones assertion that "defendants' failure to afford [the physician plaintiff] the process and protections encompassed in its bylaws amounted to arbitrary, capricious, and otherwise discriminatory conduct ... against him as a physician, and *thus* tortiously interfered with Plaintiff's business relationship with his patients...." *Okusami, supra,* 959 F.2d at 1066 (emphasis added). According to this analysis, in a case involving a physician's claim of improper or unfair application of a hospital's peer review process, a finding of arbitrary and capricious action would satisfy the element of "a purpose more culpable than 'intent.'"

14. The law of this case is accordingly that plaintiff has made out a *prima facie* case of tortious interference with prospective business advantage—and has shifted the burden to defendants to establish that their conduct was privileged—if he has proven (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendants; (3) arbitrary or capricious failure to afford him the process and protections encompassed in Providence Hospital's bylaws resulting in suspension and revocation; and (4) resultant damage.

15. Clearly the plaintiff had the expectancy of a business relationship with surgical patients, and clearly both Dr. Simmons and the hospital knew of that expectancy. We may take it as established, moreover, that the termination of plaintiff's staff position at Providence and the revocation of his privileges resulted in reduction of his income, so that the damage element was satisfied. It remains to be considered whether Dr. Simmons and Providence applied the "corrective action" and its sequelae to Dr. Canady arbitrarily or capriciously.

16. A careful review of the record yields no evidence of arbitrary and capricious action on the part of either Dr. Simmons or Providence Hospital. Dr. Simmons, vice president of the hospital for medical affairs, was presented in the case of Lucille Bishop with reports of disruptive behavior on Dr. Canady's part; with patient care concerns about

his action in transferring a patient from the intensive care unit; and with questions about whether Dr. Canady was operating outside the privileges he had been granted. After collecting incidents that had come to his attention since Dr. Canady's arrival at the hospital, Dr. Simmons quite appropriately invoked Article VII, § 1 of the bylaws and asked for an investigation. He supported his request with references to the specific activities or conduct constituting the grounds for his request. It is clear from the enclosure to Dr. Simmons' request for corrective action (which was made three days after the Bishop incident) that Dr. Simmons had been "keeping a book" on Dr. Canady, but there is nothing arbitrary and capricious about the contents of that "book." The record contains no evidence from which one could conclude or infer, and having heard the testimony of the witnesses I do not conclude or infer, that Dr. Simmons took the steps he did for any reason other than officially motivated ones related to his responsibility for patient care at Providence Hospital.

17. The suspension and revocation proceedings that took place after Dr. Simmons' request for corrective action were done in strict compliance with the bylaws. It is not for this Court to make a judgment as to whether or not the hospital was correct in its decision to revoke Dr. Canady's privileges or terminate his staff appointment. What the Court can say, after a careful review of the record, including the transcript of the two-day hearing before the Special Committee, is that plaintiff has not sustained his burden of establishing that the decision of Providence Hospital was arbitrary or capricious, or that it lacked factual support in the record, or that it was contrary to law.

18. Because plaintiff did not succeed in proving a *prima facie* case of tortious interference, he did not succeed in shifting to defendants the burden of establishing that their conduct was privileged under D.C.Code § 32–503 or under the Health Care Quality Improvement Act, 42 U.S.C. § 11111 *et seq.*

### ORDER

Upon consideration of plaintiff's objections and the suggested amendments of both plain-

tiff and defendants to the Court's tentative findings of fact and conclusions of law, and having adopted some of the suggested amendments in the findings and conclusions contained in the attached memorandum, and for the reasons set forth in the attached memorandum, it is this 2d day of October 1996 **ORDERED** that judgment in the above entitled case be entered for defendants.