959 F.2d 1062

**Taiwo OKUSAMI, M.D., Appellant,**

v.

**PSYCHIATRIC INSTITUTE OF WASHINGTON, INC., et al., Appellees.**

**No. 91-7078.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1992.

Decided March 31, 1992.

James Chandler, with whom William T. Underwood was on the brief, for appellant.

Thomas A. Guidoboni, for appellees.

Before BUCKLEY, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Separate opinion filed by Circuit Judge SENTELLE.

D.H. GINSBURG, Circuit Judge:

Dr. Taiwo Okusami brought this suit in diversity against a hospital (the Psychiatric Institute of Washington, Inc. or PIW), its medical director (Dr. Howard Hoffman), and two affiliated corporations over their handling of his application for admitting privileges at, and appointment to the medical staff of, the hospital. The district court, after having repeatedly allowed the plaintiff to amend his complaint, ultimately dismissed the case, with prejudice, for failure to state a claim upon which relief could be granted.

Taking the facts alleged in the complaint as true, *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), we affirm the judgment of the district court with respect to the counts alleging violations of the antitrust laws, intentional infliction of emotional distress, denial of "statutory due process," and conspiracy. We remand the remaining counts, alleging negligence and tortious interference with the plaintiff's business relationships, to the district court for further proceedings.

I. THE ALLEGATIONS IN THE COMPLAINT

Dr. Okusami is certified to practice medicine in the District of Columbia. The PIW is a psychiatric hospital located in the District; defendant Hoffman is the president and medical director of the PIW, and the two other corporate defendants are each said to be "the parent company of PIW."

In February 1987 the plaintiff applied for "admitting privileges and membership" with the PIW and was routinely granted those emoluments on a temporary basis "while his application was being reviewed and considered." In August 1987 the acting medical director of the PIW notified the plaintiff that because of questions raised about his care of two patients and because of his refusal to answer questions concerning a third patient, his temporary admitting privileges could be continued only under supervision. The "[p]laintiff protested this conclusion, stating, *inter alia,* that he had not been subject to the standard peer review process of being able to have his case presented and reviewed before a committee

of his peers...." The defendants rejected the plaintiff's request that they proceed pursuant to "the established peer review process ... and immediately revoked [the p]laintiff's temporary privileges." As a result, the "[p]laintiff's employment as a physician with [a health maintenance organization]" was terminated, causing him financial, physical, and emotional distress.

In taking these steps against him, the defendants "neglected to use the appropriate and mandatory procedures" set out "by PIW's own bylaws, rules, and regulations." The defendants "applied the peer review process discriminatorily" to the plaintiff, in contrast to his predecessor, and did so "in order to punish him for his prior refusal to use hospital resources that would generate additional revenues and profits for the hospital, even though use of these hospital resources had no direct contribution to proper patient care under him."

Finally, in August 1988 the plaintiff inquired of the defendant Dr. Hoffman, the PIW's medical director, about the status of his 1987 application for admitting privileges and membership at the PIW. After initially taking the position that the plaintiff would have to file a new application, Dr. Hoffman agreed that the original application would be reviewed by the PIW's Executive Committee. In April 1989, that Committee recommended that the plaintiff's application be approved subject to the condition that each of his cases "be closely reviewed by members of [the PIW's] Patient Care Evaluation Committee." The plaintiff protested this "unusual and irregular requirement" and "requested a 'fair hearing' as provided under the Fair Hearing Plan of the PIW bylaws." The defendants declined to grant such a hearing but in June 1989 nonetheless approved the plaintiff's application without the disputed condition.

## II. ANALYSIS

For clarity of exposition, we group the plaintiff's claims into two categories: antitrust and tort.

### A. The Antitrust Claims

Upon the basis of the foregoing factual allegations, without more, the plaintiff charges the defendants with "Violation of Antitrust Laws in Restraint of Trade" and "Conspiracy to Violate the Federal Antitrust Laws." The defendants counter that the antitrust counts do not state a claim for relief because the complaint fails to allege (1) an "antitrust injury," that is, an injury caused by a lessening of competition; (2) an effect on interstate commerce; and (3) a cognizable conspiracy. The last point is made on the strength of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777, 104 S.Ct. 2731, 2744, 81 L.Ed.2d 628 (1984), in which the Supreme Court overruled prior cases approving the "bathtub conspiracy" theory of antitrust liability, and held that a corporation "and its wholly owned subsidiary ... are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." *See also id.* at 769, 104 S.Ct. at 2741 ("officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy") and at 770 n. 15, 104 S.Ct. at 2741 n. 15 ("corporations cannot conspire with their own officers").

The plaintiff argues on brief that his complaint is sufficient because, under *Summit Health, Ltd. v. Pinhas*, —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), "an alleged restraint on his provision of psychiatric services accomplished by an alleged misuse of a congressionally regulated peer review process" establishes both (1) the lessening of competition and (2) the interstate commerce elements of a cause of action under § 1 of the Sherman Act. *But see* Stephen Calkins, *The 1990–91 Supreme Court Term and Antitrust: Toward Greater Certainty*, 60 Antitrust L.J. 603, 604 (1992) ("*Summit Health* majority opinion is subject to conflicting interpretations, and failed to resolve the tensions and correct the misunderstandings that underlie the interstate commerce requirement").

■ With regard to the conspiracy element of the cause, we note as a preliminary matter that the complaint does not on its face allege any agreement among the de-

fendants. By attributing form and intention to the indistinct figures discernible through the fog that is the complaint, one with a particularly vivid imagination might think he sees there portrayed a conspiracy among the defendants—the PIW, its two corporate parents, and Dr. Hoffman, "the President and Medical Director for The [PIW]." Even if such an agreement be assumed, however, *Copperweld*, which reasons that two entities (whether a corporation and an individual or two corporations) cannot conspire under § 1 of the Sherman Act if they "have a complete unity of interest," 467 U.S. at 771, 104 S.Ct. at 2741, would seem clearly to preclude finding a conspiracy among this group.

The plaintiff stakes his all upon the proposition that, notwithstanding *Copperweld*, "a hospital and the members of staff are ... capable of conspiring with one another" under the Sherman Act. *Compare Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273, 1280 (11th Cir.1988) ("A hospital and the members of its medical staff, in contrast to a corporation and its agents, are legally separate entities, and consequently there is no similar danger that what is in fact unilateral activity will be bootstrapped into a 'conspiracy' ") *and Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450 (9th Cir.1988) (finding the interests of the doctors and hospital involved to be "sufficiently independent so that the collaborated conduct between [them] coalesced economic power previously directed at disparate goals") *with Weiss v. York Hosp.*, 745 F.2d 786, 814–15 (3d Cir.1984) ("We ... agree ... that the hospital cannot legally conspire with its medical staff") *and Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 573 (6th Cir.1986) ("Because [the defendant doctors] are officers and agents of [the defendant hospital], they thus lack the capacity to conspire with [the defendant hospital]"). The whole of the plaintiff's theory, as applied to the defendants before us, is that although Dr. Hoffman "may have been the ag-.nt for Defendant PIW for some purposes, their interests are not as wed as the ties between a corporation and its officers or employees"; because their economic interests diverge, that is, they are to be regarded in law as independent actors who are capable of conspiring.

Interesting as these issues are, we need not resolve any of them today. Even assuming that a hospital and its staff may in some circumstances conspire under the Sherman Act, we have no basis upon which to say that a hospital and its medical staff necessarily have divergent interests, nor do we read any of the relevant cases to say as much. Failing that, we have searched the complaint in vain for any allegation whatsoever to the effect that Dr. Hoffman's interests in particular differ from those of the corporate co-defendants. There is no allegation that he himself practices medicine at all, or indeed that he has any economic interest independent of that of the PIW. We can hardly assume that, simply because he is entitled to be called "doctor," his interests somehow diverge from those of the corporation of which he is president and align him with other, unspecified doctors in a conspiracy to suppress the plaintiff's competition in the provision of psychiatric services. If anything, the allegation that the defendants were motivated "to punish [the plaintiff] for his prior refusal to use [additional] hospital resources" surely suggests that Dr. Hoffman's interests were in harmony with those of the corporate defendants. (The plaintiff might have argued that the unity of economic interest between Dr. Hoffman and the PIW is an affirmative defense, which need not be anticipated in the complaint. The plaintiff made no such argument, however, and we take the case as we find it—with the issues as framed by the parties.)

▇ Without Dr. Hoffman's complicity, moreover, there can be no conspiracy at all, as the parent and subsidiary corporate defendants cannot alone constitute a conspiracy in light of *Copperweld*. Accordingly, the plaintiff's antitrust claims, lacking the essential element of an agreement, were properly dismissed for failure to state a claim upon which relief could be granted. So too his statutory due process claim, which the appellant conceded at oral argu-

ment depends entirely upon the viability of the antitrust claims.

█ The appellant also argues that even if the antitrust claims were properly dismissed, they should not have been dismissed with prejudice: Dismissal based upon Rules 8(a)(2) and 41(b), he points out, is "a harsh sanction which should be resorted to only in extreme cases." But the district court dismissed for "fail[ure] to state a claim upon which relief can be granted." A dismissal on that ground, pursuant to Rule 12(b)(6), is a resolution on the merits and is ordinarily prejudicial. The appellant does not argue otherwise; he merely misreads the district court as having proceeded under the earlier-cited rules. Proceeding as it does from an erroneous premise, his argument against prejudice attaching is beside the point.

## B. The Tort Claims.

█ *Negligence.* The plaintiff's claim for negligence depends upon the proposition that the PIW bylaws impose upon the defendants a duty to afford him certain procedural rights. The district court dismissed this count for failure to state a claim upon which relief can be granted, but did not specifically identify the deficiency in the pleading. The defendants assert that plaintiff "failed either to plead or to incorporate those bylaws" into his complaint, and thus "fail[ed] to identify what duty was breached, and ... how the breach, if any, injured" him.

We part company with the defendants at the threshold of this argument; in our view the bylaws are adequately incorporated into the complaint. The complaint itself is replete with references to them. *See, e.g.,* paragraphs 10 ("Defendants' own bylaws, rules and regulations"), 16 (specific description of peer review process), and 18 (defendants "neglected to use the appropriate and mandatory procedures outlined in the bylaws"), and Appendix II, which consists of a section of the bylaws entitled "Fair Hearing Plan." Although the origin of the Appendix was not identified, the defendants could hardly have failed to recognize their own bylaws. Hence, the complaint is

sufficient "to give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983).

█ *Tortious interference.* The district court also dismissed the claim for "tortious interference with plaintiff-physician's business relationship with his patients," pursuant to Rule 12(b)(6), again without specifying the deficiency. The defendants support the district court's decision on the ground that the plaintiff did not allege "[a]n intent to interfere by defendant." Not so. *See* paragraph 19 ("Defendants purposefully applied the peer review process discriminatorily to him to interfere with his function as a physician"); *see also* paragraph 30 ("Defendants' failure to afford him the process and protections encompassed in its bylaws amounted to arbitrary, capricious, and otherwise discriminatory conduct ... against him as a physician, and thus tortiously interfered with Plaintiff's business relationship with his patients"). We therefore hold that the claim for tortious interference, like the claim for negligence, is adequately pled.

█ *Civil conspiracy.* The complaint alleges that the defendants engaged in a civil conspiracy to act negligently. "[I]n the District of Columbia a conspiracy requires: an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Halberstam v. Welch,* 705 F.2d 472, 487 (D.C.Cir.1983). Thus, in order to state a cause of action, the plaintiff need only allege, in addition to negligence, an agreement to take part in the negligent conduct.

As we noted in connection with the antitrust claims, however, the complaint alleges no agreement of any kind. Assuming that an agreement could be inferred from the facts that are alleged, moreover, the plaintiff does not explain how a single entity—the PIW, one of its officers, and two parent corporations—may be liable for civil conspiracy. *See, e.g., Michelin v. Jenkins,* 704 F.Supp. 1, 4 (D.D.C.1989) ("there can

be no conspiracy between the District of Columbia Board of Education and its officials ..., since these defendants comprise a single entity, not capable of entering into a conspiracy"); *cf. Copperweld,* 467 U.S. at 777, 104 S.Ct. at 2744 (corporation and wholly owned subsidiary cannot conspire under § 1 of the Sherman Act). The dismissal of the civil conspiracy claim is therefore affirmed.

█ *Intentional distress.* The plaintiff also asserts that the defendants intentionally inflicted mental, emotional, and physical distress upon him. In the absence of physical injury, "extreme and outrageous" conduct is a necessary element of this tort. *See Abourezk v. New York Airlines, Inc.,* 895 F.2d 1456, 1458 (D.C.Cir.1990). Because no such conduct has been alleged, we affirm the court's dismissal of this claim.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. The plaintiff's claims for negligence and for tortious interference with his business relationships are remanded to that court for further proceedings.

*So ordered.*

SENTELLE, Circuit Judge, concurring in part and dissenting in part:

I concur in my colleagues' affirmance of the dismissal of the counts alleging violations of the antitrust laws, intentional infliction of emotional distress, denial of "statutory due process," and conspiracy. I dissent from my colleagues' reversal of the dismissal of the counts of negligence and tortious interference.

At the outset, I wish to set forth a complete procedural history of the case at the district level in order to allay any fear the reader might harbor that the District Court failed to provide the plaintiff with the liberal standard of construction contemplated by the Federal Rules.[1] *See* 5A WRIGHT &

MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1356, at 296–98. Plaintiff filed this action in the District Court on April 6, 1990. The defendants moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. Dr. Okusami filed an amended complaint, virtually identical to the original, on June 5, 1990. Defendants again moved to dismiss for lack of jurisdiction and failure to state a claim. On June 21, 1990, Dr. Okusami filed a "Second Amended Complaint" which purported to add a party and drop a party, apparently intending to cure a lack of diversity. Defendants again moved to dismiss on the same grounds. In addition, the defendants sought dismissal because plaintiff had failed to obtain leave of court to file this second amended complaint. Dr. Okusami then filed a motion for leave to file a second amended complaint. On October 23, 1990, the District Court entered a Memorandum and Order stating, *inter alia:*

Despite three attempts at stating a viable claim for relief—plaintiff has tendered a "second amended complaint" for filing—and the multiple theories of recovery he advances, he has yet to allege any *facts* tending to show that the hospital was not entirely within its rights in insisting upon supervision of his patient care, in refusing him any formal peer review as a condition precedent to supervision, and in terminating his temporary admitting privileges when he refused to submit to supervision. Absent any such allegations of fact, his general conclusory allegations of wrongdoing are insufficient as a matter of law to require defendants to make a defense to them....

Nonetheless, the Court granted plaintiff leave to file one more attempt to comply with Fed.R.Civ.P. 8(a). Failure to so comply would result in dismissal with prejudice. At this point I would remind the reader that Fed.R.Civ.P. 8(a) requires that "a pleading which sets forth a claim for relief ... shall contain ... a short and

---

1. The compilation of this complete procedural history was hampered somewhat by the woefully incomplete appendix filed by appellant in this Court. The appendix contains neither the "relevant docket entries in the proceeding below" required by Fed.R.App.P. 30(a), nor any of the pleadings preceding the fifth attempt at the complaint.

plain statement of the claim showing that the pleader is entitled to relief...."

On October 31, 1990, plaintiff filed his "Court–Granted Second Amended Complaint." Defendants moved to dismiss for failure to state a claim. On April 26, 1991, the District Court entered the order of dismissal from which Dr. Okusami now appeals.

In order that the reader may make an informed personal decision as to the compliance of Dr. Okusami's fifth attempt at a complaint meeting the requirements of Rule 8(a), Rule 12(b)(6), and the Court's order, I attach a copy of that entire complaint along with eleven exhibits apparently filed with it, though only four of them appear to be referenced therein. At this point I suggest the reader peruse those documents.

While I am tempted at this point to rest upon Dr. Okusami's pleadings, I will proceed with a short further discussion of my reasons for believing that the District Court's dismissal of the negligence and tortious interference claims was correct.

## The Negligence Actions

Counts I and II of the Second Amended Complaint purport to set forth claims for negligence. I had thought it axiomatic that negligence requires a duty on the part of the defendant running toward the plaintiff to conform to a certain standard of conduct to protect the plaintiff against unreasonable risks, and that the plaintiff must further plead and prove a failure on the part of the defendant to conform to the standard of conduct, and that the failure proximately caused an actual loss or damage to the plaintiff. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 30 (5th ed. 1984), and authorities collected therein. I find nothing in the complaint that sets forth any duty on the part of the defendants running toward Dr. Okusami; any failure by the defendants to meet the standard of conduct contemplated by that duty; or any damages proximately caused thereby. I would note at this point that I do not share the majority's ease in determining that Appendix 2, the untitled

"Exhibit 8," referenced nowhere in the complaint, has any relevance. Again, I thought it axiomatic that Rule 12(b)(6) tests the sufficiency of the complaint, without reference to evidence. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 235, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1973). I find nothing in Dr. Okusami's complaint that tells me that this exhibit is part of the defendants' by-laws, that it applies to him if it is part of the by-laws, or that defendants should recognize it as such.

I, therefore, would affirm the dismissal.

## Tortious Interference

I would also affirm the District Court's dismissal of Counts VIII and IX, each of which purports to allege "Tortious Interference With Plaintiff–Physician's Business Relationship With His Patients." Second Amended Complaint at 11, 12. Count VIII in a single sentence "repeats, realleges and incorporates by reference paragraphs 1 through 22 of [the] complaint." Count IX is identical except that it realleges and incorporates "paragraphs 1 through 30." *Id.*

The law of the District of Columbia governs this diversity action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gray v. American Express*, 743 F.2d 10, 16–17 (D.C.Cir.1984). The plaintiff offered us no law stating the circumstances under which the District of Columbia recognizes a tort for interference with business relationships. However, in at least two cases, our district courts have had occasion to apply District of Columbia law on this subject.

In *Business Equipment Center Ltd. v. DeJur Amsco Corp.*, 465 F.Supp. 775 (D.D.C.1978), Judge Gasch noted that "[i]nterference with business relations is a tort that can arise in two situations." *Id.* at 788. He described these as (1) where "there is interference with a contract between the plaintiff and some third party," and (2) where the defendant interferes with the "plaintiff's prospective business advantage." *Id.*

In *Genetic Systems Corp. v. Abbott Laboratories,* 691 F.Supp. 407 (D.D.C.1988), Judge Joyce Hens Green stated:

To establish a claim for tortious interference with prospective economic advantage, a plaintiff ordinarily must plead (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.

*Id.* at 422–23.

Nothing I see in the complaint alleges such a factual predicate. I recognize that paragraph 19 does state that the "Defendants purposefully applied the peer review process discriminatorily to him to interfere with his function as a physician, *not* as they stated in the PIW letter of August 14, 1987, 2nd paragraph. (*See Plaintiff's Exhibit 2*)." However, it is my understanding of Rule 12(b)(6) practice that a court must accept only well-pleaded allegations of fact, it need not "accept 'legal conclusions.'" 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357, at 315, and authorities collected therein. I see in this cryptic paragraph of the complaint at most a conclusion of law.

CONCLUSION

While dismissal is an extreme remedy, when repeated attempts to state a claim for relief fail to do so, it does not to me appear an improper one. *Maddox v. Shroyer,* 302 F.2d 903 (D.C.Cir.1962) (affirming dismissal after repeated attempts to state a claim complying with the Federal Rules of Civil Procedure failed). Unless it is an appropriate remedy for such inadequate pleading, then I perceive no office that Rule 12(b)(6) can perform. In my view, the District Court correctly held this to be an appropriate case for that remedy. I would affirm.

# APPENDIX

APPENDIX TO DISSENT OF CIRCUIT JUDGE DAVID B. SENTELLE.
No. 91-7078 - Okusami v. Psychiatric Institute of Washington

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAIWO OKUSAMI, M.D.<br>9 Bitterroot Court<br>Rockville, Maryland 20853, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| THE PSYCHIATRIC INSTITUTE<br>  OF WASHINGTON, D.C.<br>4460 MacArthur Boulevard, N.W.<br>Washington, D.C. 20007 | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| and | ) CA NO. 90-800 |
| | ) Jackson, J. (TPJ) |
| HOWARD A. HOFFMAN, M.D.<br>President and Medical Director<br>The Psychiatric Institute of<br>  Washington, D.C.<br>4460 MacArthur Boulevard, N.W.<br>Washington, D.C. 20007 | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| and | ) |
| | ) |
| PSYCHIATRIC INSTITUTES OF<br>  AMERICA, INC.<br>1010 Wisconsin Avenue, Suite 900<br>Washington, D.C. 20007 | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Serve on: | ) |
| | ) |
| Resident Agent<br>Edward Parker<br>5511 Staplesmill Road<br>Richmond, Virginia 23228 | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| and | ) |
| | ) |
| President<br>NATIONAL MEDICAL ENTERPRISES, INC.<br>1160 Wilshire Boulevard<br>Los Angeles, CA 90925 | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

*Cir: 96 - Sci.
71 7*

## COURT-GRANTED SECOND AMENDED COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

Plaintiff Taiwo Okusami, M.D., by and through his counsel, Charles Jerome Ware, P.A., for his Complaint against the Defendants for damages and for injunctive relief in this action, alleges:

### Parties and Jurisdiction

1.    The Plaintiff, Taiwo Okusami, M.D., is a citizen of Nigeria and a resident of the State of Maryland and a physician certified to practice medicine in the District of Columbia.

2.    The Defendant, The Psychiatric Institute of Washington, D.C. ("PIW"), is a corporation organized under the laws of the District of Columbia, and has its principal place of business in the District of Columbia, whose self-expressed purpose is to serve as a psychiatric hospital providing patient care, education and research.

3.    The Defendant, Howard A. Hoffman, M.D., is a citizen of the United States, and a resident of the District of Columbia, and is employed as the President and Medical Director for The Psychiatric Institute of Washington, D.C. ("PIW").

4.    The Defendant, Psychiatric Institutes of America, Inc., is incorporated in Delaware and Virginia, has its principal place of business in the District of Columbia, and is the parent of defendant The Psychiatric Institute of Washington, D.C. ("PIW"), which is also located in the District of Columbia.

- 2 -

5.     The Defendant, National Medical Enterprises, Inc. ("NME"), is a corporation organized under the laws of the State of Nevada; and has its principal place of business in Los Angeles, California, and is the parent company of PIW.

6.     The wrongful acts alleged herein occurred in the District of Columbia.

7.     The amount in controversy exceeds $50,000.00 in that the amount of damages sought is $5 million.

8.     The Court has jurisdiction under 28 U.S.C. Section 1332, diversity of citizenship.

9.     Venue is based, inter alia, on 28 U.S.C. Section 1391, in that The Psychiatric Institute of Washington, D.C. maintains its principal place of business in the Washington, D.C. judicial district.

10.     The Plaintiff, Taiwo Okusami, M.D., seeks (i) compensatory and punitive damages and (ii) injunctive relief against the Defendants for unlawfully denying him medical staff privileges; failing to afford or provide him with the process and protections encompassed by District of Columbia regulatory codes 32-502, 32-503, 32-1307, 32-1308, 32-1309, et al.; failing to afford or provide him with the due process and equal protection encompassed by Federal law (see para. 30, infra); the Joint Commission Accreditation for Hospitals (JCAH) quality assurance guidelines; District of Columbia law; Defendants' own bylaws, rules and regulations; arbitrary, capricious, and otherwise discriminatory conduct by Defendants against the Plaintiff; defamation of his character orally and in referenced

- 3 -

written documentation; tortious interference with Plaintiff's business; negligence; civil conspiracy to wrongfully deny Plaintiff the right or opportunity to practice his profession as a psychiatrist; violation of the Federal antitrust laws in restraint of trade (The Sherman Act), 15 U.S.C. Section 1 (1982); Injunction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. Section 25 (1982); and Treble Damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. 15 (1982) ); conspiracy to violate the Federal Antitrust laws; defamation; and tort of intentional infliction of mental, emotional and physical distress.

### COUNT I - Negligence

11. Plaintiff repeats, realleges and incorporates by reference paragraph 1 through 10 of this Complaint. On or about February 13, 1987, plaintiff Taiwo Okusami, M.D., made application for admitting privileges and membership with The Psychiatric Institute of Washington, D.C. (hereinafter "PIW"). (See Plaintiff's Exhibit 1, February 13, 1987, Physician Application For Appointment to the Medical Staff).

Plaintiff was routinely granted temporary membership and admitting privileges while his application was being reviewed and considered.

12. On or about August 14, 1987, at a meeting called by acting medical director Lawrence Brain, M.D., and held at PIW, plaintiff Okusami, to his surprise, was informed by Dr. Brain that two of his patient cases had been reviewed and that questions were raised regarding his patient care; that a Dr. Greenberg of the Patient Care Evaluation Committee of PIW, had alleged that plaintiff had refused to answer Greenberg's questions

- 4 -

about another patient that Greenberg had reviewed; and that, as a result of these alleged concerns raised, PIW officials believed that supervision of Plaintiff was needed in order to maintain Plaintiff's temporary membership and admitting privileges.

13. Plaintiff protested this conclusion, stating, inter alia, that he had not been subject to the standard peer review process of being able to have his case presented and reviewed before a committee of his peers, as required by Federal law, the Defendants' by-laws, District of Columbia law, JCAH rules, et al.; and that he requested the implementation of that mandatory process in this case.

14. Stating that Plaintiff was a physician with temporary privileges only, Defendants asserted their right to impose whatever supervision restraints on him they believed necessary, using this more as a punishment but without guidelines.

15. Plaintiff responded that he would willingly accept supervision provided he was afforded the opportunity to respond to PIW's concerns by way of the established peer review process.

16. Defendants, individually and collectively, rejected this request of Plaintiff, and immediately revoked Plaintiff's temporary privileges without giving him the required or mandatory opportunity to present his case before a committee of his peers.

The peer review process requires that when reviews of a physician's performance is unsatisfactory, the affected physician -- at a minimum -- has a legal right to all of the review materials and the

- 5 -

opportunity to respond to such unsatifactory concerns raised by the peer review committee before any discipline, conclusion or censorship of any form or type is forced upon the physician. This important and mandatory peer review process is what Dr. Okusami rightfully requested and was wrongfully denied. (See, for strong support, cases in par. 30, infra; including Balkinson v. Capital Hill Hospital, 558A2d 304 (D.C. App. 1989).

17. As a direct and proximate result of Defendants' unlawful revocation of Plaintiff's temporary membership and admitting privileges, Plaintiff's employment as a physician with the Group Health Association ("GHA") was revoked and terminated as well, causing plaintiff Okusami severe financial, economic, mental, emotional and physical distress; defamation of his character as a professional, and overall professional embarrassment, because of his lack of employment due to this revocation of privileges.

18. Defendants' actions, individually and collectively, against Plaintiff were negligent in that they adopted their own procedures merely as a punishment and neglected to use the appropriate and mandatory procedures outlined in the bylaws; and defendants' actions were arbitrary, capricious and discriminatory, and did not afford Plaintiff due process through the necessary committee reviews and hearings as required or mandated (i) by PIW's own bylaws, rules and regulations; as mandated or required by (ii) PIW's licensing authorities, including the District of Columbia, pursuant to District of Columbia regulatory codes 32-502, 32-503,

- 6 -

et al.; (iii) as required by JCAH quality assurance guidelines; (iv) and as required by Federal law (See par. 30, infra).

19. Further, Defendants purposefully applied the peer review process discriminatorily to him to interfere with his function as a physician, not as they stated in the PIW letter of August 14, 1987, 2nd paragraph. (See Plaintiff's Exhibit 2).

20. The evidence for 19, supra, is obvious in that PIW could not be doing the review routinely and not have discovered that Dr. Cavender, plaintiff Okusami's predecessor, did not have a submitted application on board: a necessary requirement before any physician could be granted temporary privileges.

21. Further, Defendants wrote a letter (dated on or about August 14, 1987) to Dr. Cavender requesting that he submit an application. This letter to Dr. Cavender from PIW was written only after plaintiff Okusami had questioned the basis for such reviews of him at the meeting held on the morning of August 14, 1987. Dr. Cavender never submitted the completed application forms.

22. Plaintiff Okusami urges the Court to review in toto all of the submitted documents in this case, including the Opposition To And Answer To Defendants' Motion To Dismiss Proposed Second Amended Complaint (filed on July 19, 1990), in support of his assertion that the sole purpose for Defendants' discriminatory treatment of him was to punish him for his prior refusal to use hospital resources that would generate additional

revenues and profits for the hospital, even though use of these hospital resources had no direct contribution to proper patient care under him.

### COUNT II - Negligence

23.    Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 22 of this Complaint.  On or about August 22, 1988, plaintiff Okusami inquired of PIW's Howard Hoffman, M.D., medical director, as to the status of Plaintiff's February 13, 1987 application to PIW for admitting privileges and membership.  (See Plaintiff's Exhibit 4 letter of September 6, 1988 regarding letter of August 22, 1988, from Taiwo Okusami, M.D., to Howard Hoffman).

24.    Defendant Hoffman responded that Plaintiff Okusami should file a new application for membership and admitting privileges, since Plaintiff's temporary membership and admitting privileges had been revoked, - even though no approval or denial had been made regarding the initial application filed by Plaintiff.

25.    Plaintiff countered to Defendant Hoffman that PIW's bylaws and rules, Federal law, JCAH rules, and District of Columbia regulatory codes 32-502, 32-503, et al., required a formal action to be taken on his previous February 13, 1987 application, and that specifically the PIW Executive Committee was the proper decision-making body to rule on Plaintiff's application; and that the PIW Executive Committee in fact had not as yet ruled on Plaintiff's application as required by the rules and procedures; so why should Plaintiff have to submit a new application?

- 8 -

26. Defendant Hoffman then stated that plaintiff's "old application" would be reviewed by the Executive Committee.

27. Subsequently, on or about April 18, 1989, the PIW Executive Committee recommended approval of Plaintiff's application. (See Plaintiff's Exhibit 9, letter of April 18, 1989, from PIW administrator Al Smith to Dr. Taiwo Okusami.) However, the Executive Committee also instituted the unusual, discriminatory, arbitrary, capricious and irregular requirement that "...each of [Dr. Okusami's] cases will be closely reviewed by members of [PIW's] Patient Care Evaluation Committee," but did not state the established criteria for this requirement, nor was able to justify the use of this requirement on Plaintiff, but not on any other physician.

28. Plaintiff protested that this unusual and irregular requirement was discriminatory, arbitrary and capricious; and Plaintiff then requested a "fair hearing" as provided under the Fair Hearing Plan of the PIW bylaws.

29. Defendants denied Plaintiff's request for a "fair hearing", with no real basis, and the PIW Board of Directors eventually approved Plaintiff's application on June 21, 1989. Plaintiff, by this time and since, has suffered severe financial, economic, mental, emotional and physical distress, and professional embarrassment, from his lack of employment due to his revocation of privileges, as a direct and proximate result of these unlawful actions of Defendants.

30. Plaintiff Okusami alleges that the Defendants' failure to afford him the process and protections encompassed in its bylaws amounted

- 9 -

to arbitrary, capricious, and otherwise discriminatory conduct by the hospital, PIW, and the other Defendants against him as a physician, and thus tortiously interfered with Plaintiff's business relationship with his patients, among other wrongdoing. These allegations by plaintiff Okusami are supported -- and relief as a matter of law must be given to him, pursuant to the opinions, inter alia, of the District of Columbia Court of Appeals (Gallagher, Senior Judge) in Balkissoon v. Capitol Hill Hospital, 558 A.2d 304 (D.C. App. 1989); the Fourth Circuit U.S. Court of Appeals in United States v. Newcomb Hospital, 192 A.2d 817 (1963); Eaton v. Grubbs, 329 F.2d 710 (CA4, 1964); Suckle v. Madison General Hospital, 326 F. Supp. 1196, affirmed, 499 F.2d 136 (CA7, 1974); Sosa v. Board of Managers of the Val Verde Memorial Hospital, 432 F.2d 173 (CA5, 1971); Garrow v. Elizabeth General Hospital, 382 A.2d 393 (1978); and Anton v. San Antonio Community Hospital, 567 P.2d 1162 (Cal. App. 1977).

## COUNT III

### Civil Conspiracy to Wrongfully Deny
### Plaintiff Okusami the Right or Opportunity
### to Practice His Profession as a Psychiatrist

(Pursuant to Common-Law; 15 A.C.J.S. Conspiracy (1); et al)

31. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 30 of this Complaint.

## COUNT IV

### Violation of Antitrust Laws in Restraint of Trade

32. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 22 of this Complaint.

## COUNT V

### Violation of Antitrust Laws in Restraint of Trade

33. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 30 of this Complaint.

## COUNT VI

### Conspiracy to Violate the Federal Antitrust Laws

34. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 22 of this Complaint.

## COUNT VII

### Conspiracy to Violate the Federal Antitrust Laws

35. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 30 of this Complaint.

## COUNT VIII

### Tortious Interference With Plaintiff-Physician's Business Relationship With His Patients

36. Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 22 of this Complaint.

- 11 -

## COUNT IX

### Tortious Interference With Plaintiff-Physician's Business Relationship With His Patients

37.     Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 30 of this Complaint.

## COUNT X - Defamation

38.     Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 37 of this Complaint.

## COUNT XI

### The Tort of Intentional Infliction of Mental, Emotional and Physical Distress

39.     Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 38 of this Complaint.

## COUNT XII

### The Tort of Intentional Infliction of Mental, Emotional and Physical Distress

40.     Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 39 of this Complaint.

WHEREFORE, Plaintiff demands judgment as follows:

(1)     That Defendants' action in revoking or suspending Plaintiff's medical staff privileges be enjoined or set aside, and that Defendants be enjoined from maintaining any references and/or documentation, oral and/or written, of such revocation or suspension of Plaintiff's privileges;

- 12 -

(2)    That the Court award Plaintiff compensatory and punitive damages against all of the Defendants, jointly and severally, in the amount of $5 million; and

(3)    That the Court award Plaintiff his costs and attorneys' fees in this action, and grant such other and further relief as is just and proper.

Respectfully submitted,

_____
Taiwo Okusami, M.D.
Plaintiff

10-30-90

By: _____
Charles Jerome Ware, P.A., Esquire
(D.C. Bar No. 372092)
CHARLES JEROME WARE, P.A. AND
    ASSOCIATES
7468 Weatherworn Way
Columbia, Maryland 21046-1461
(301) 720-6129

Attorney for Plaintiff

- 13 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct and originally-signed copy of the foregoing Court-Granted Second Amended Complaint was mailed first-class, postage prepaid to this 30th day of October, 1990, to:

Thomas A. Guidoboni and
Thomas B. Shull
Bonner & O'Connell
Suite 1000
900 - 17th Street, N.W.
Washington, DC 20006

Charles Jerome Ware, P.A.

THE PSYCHIL INSTITUTE
OF WASHINGTON, D.C. **FILED** (1) PHYSICIAN APPLICATION FOR
4460 MacArthur Boulevard, N.W. APPOINTMENT TO THE MEDICAL STAFF
Washington, D.C. 20007
(202) 844-3400 OCT 3 : 1990

Name In Full __OKUSAMI_____TAIWO_____ Date _2/13/87_
_____(Last)_____(First)_____(Middle)
Office Address _1005, 21st ST   N.W, DC. 20036_ Telephone _828-7759_
Residence Address _7, BITTERROOT CT   ROCKVILLE, MD_ Telephone _929-1772_
Date of Birth _3-15-47_____ Birthplace _____

Premedical Education: College or University _____
                     Degree _____ Date of Graduation _____
Medical Education:   Medical School _UNIVERSITY  OF  IBADAN_____
                     Address _____
                     Degree _MB.CH.B ( M.D )__NIGERIA_ Date of Graduation _1973_
Internship: Hospital _GENERAL HOSPITAL, LAGOS_ Date 7/72 to 6/74  ☑ Rotating ☐ Special
Residency: Hospital _MEDCAL COLLEGE OF VA, RICH_ Date 7/74 to 6/77 Specialty _PSYCHIATRY_
           Hospital _NORthern VA, Mental Health Inst._ Date 7/22 to 6/76 Specialty _____
Fellowship _CHILDRENS HOSPITAL (GEORGE WASH UN._ Date _7/76 - 6/81_
Assistantships 1. _____ Date _____
               2. _____ Date _____

Teaching Appointments 1. _HOWARD  UNIVERSITY_ Date _7/80 - 5/81_
                      2. _____

Postgraduate Education 1. _____
                         (Institution, Preceptor, Address)
                       2. _____
                         (Institution, Preceptor, Address)

Current D.C.
Licensure No. _11520_____ _1979_____ Registry No. _____ ☐ Reciprocity ☑ Examination
             District of Columbia   Date Issued

Other
Licenses _MD_____ _Dec 1982_ License No. _326837_ Registry No. ____ ☑ Reciprocity ☐ Examination
         State or Province   Date Issued
DEA License No. _AO 92-48958_
Have you ever been convicted of a felony? ☐ Yes ☑ No   If yes, give details on separate sheet.
Has your license to practice medicine in any jurisdiction ever been suspended or revoked? ☐ Yes ☑ No
                                                                   If yes, give details on separate sheet
Has your DEA number ever been rescinded? ☐ Yes ☑ No   If yes, give details on separate sheet.
Membership on Other Hospital Staffs (Past and Present) _____
_____
_____
_____
_____
_____

Turn Page To Continue Application

PLAINTIFF'S EXHIBIT
01: 90-800

Psychiatry, Qualifications and ......, ......, ....... ... ...

Experience: *7yrs post-graduate experience as a psychiatrist in outpatient and in-patient treatment at Washington Adventist and since 1982 as psychiatrist in Group Health Ass:*

Qualifications: *Board Certified by in General and Child Psychiatry*

**2. Internist**
- ☐ a. Privileges to do medical histories and physicals.
- ☐ b. Privileges to examine, evaluate, and recommend treatment for patients with medical problems.
- ☐ c. Privileges to treat medical problems.

**3. Gynecologist**
- ☐ a. Privileges to examine, evaluate, and recommend treatment to patients with gynecological problems.
- ☐ b. Privileges to treat patients with gynecological problems.

**4. Obstetrician**
- a. Privileges to examine, evaluate, and recommend treatment for patients with obstetrical problems.
- b. Privileges to treat patients with obstetrical problems.

**5. Pediatrician**
- ☐ a. Privileges to examine, evaluate and recommend treatment for patients with pediatric problems.
- ☐ b. Privileges to treat patients with pediatric problems.

**6. Neurologist**
- ☐ a. Privileges to examine, evaluate, and recommend treatment for patients with neurological problems
- ☐ b. Privileges to treat patient with neurological problems.

**7. Orthopedic Surgeon**
- ☐ a. Privileges to examine, evaluate, and recommend treatment for patient with orthopedic problems.
- ☐ b. Privileges to treat patients with orthopedic problems.

**8. Surgeon**
- ☐ a. Privileges to examine, evaluate, and recommend treatment for patients with surgical problems.
- ☐ b. Privileges to treat patients for minor surgical problems.

**9. Ophthalmologist**
- ☐ a. Privileges to examine, evaluate, and recommend treatment for patients with ophthalmologic problems
- ☐ b. Privileges to treat patients with ophthalmologic problems.

**10. Dentist**
- ☐ a. Privileges to examine, evaluate, and recommend treatment for patients with dental problems.
- ☐ b. Privileges to treat patients with dental problems.

Previous Experience in Specialties Applied for: *See above ↑*

Continued on Page .

**THE PSYCHIATRIC INSTITUTE
OF WASHINGTON, D.C.**

4460 MacArthur Boulevard NW
Washington, D.C. 20007
(202) 944-3400
TDD for the Hearing Impaired 944-3516

FILED

'79T 3  1990

August 14, 1987

Taiwo Okusami, MD
Group Health Association
Medical Director's Office
4301 Connecticut Ave., NW
Washington, DC  20008

Dear Dr. Okusami:

This letter is a follow-up to our meeting held on Friday, August 14, 1987. Also present at that meeting were Harvey Kalin, MD, Dr. William Cavendar, MD, Donald Silver and Wanda Miller. The Psychiatric Institute of Washington (PIW) had granted you temporary privileges. As part of the privileging process, you submitted your application for active medical staff privileges. As part of your application, you had signed an acknowledgement indicating you "received and read the bylaws of the hospital governing body and the bylaws rules and regulations of the medical staff and agree to be bound by the terms thereof."

As part of our process of reviewing applications for active privileges at our facility, we selectively review concurrently those patients which an Attending is treating under their temporary privilege status. Our first review of one of your cases raised some clinical questions regarding the care that was being provided by you to one of your patients. At our last Executive Committee meeting of the medical staff it was decided not to further process your application, pending further review of patients that you were treating under temporary privilege status. Further review of patients under your care raised other issues of questions regarding the services you were providing to your patients. On Thursday, August 13, 1987, Richard Greenberg, MD, on behalf of the Patient Care Evaluation Committee contacted you to share with you our concerns. During his discussion you were not open to fully discuss these clinical issues. In fact, you indicated that all issues should be dealt directly through GHA. This is in direct conflict with our Medical Staff Bylaws, whereby you are required to be responsive to quality assurance questions raised regarding patient care.

Psychiatric Institutes of America
part of the NME Specialty Hospital Group

Page Two

Due to questions being raised regarding the care you are
providing to your patients and your refusal to work within the
policy and procedures of the PIW medical staff bylaws and rules
and regulations, we found it necessary to immediately place you
upon supervision. Since you were not receptive to this
supervision, PIW hereby revokes your temporary privileges to
attend patients. This revocation is effective immediately.

At this meeting Dr. Kalin was requested to immediately assign
another GHA physician who has active attending privileges in good
standing to attend current GHA patients.

Yours truly,

Lawrence A. Brain, MD / Wanda Weller

Laurence A. Brain, MD
Acting Medical Director
Psychiatric Institute of Washington

Enclosures:

August 5, 1987 memo from Howard Hoffman, MD to PCEC
Case Review -- Ruby Williams

August 6, 1987 memo from Laurence Brain, MD to Howard Hoffman, MD
RE: David Whiteman

August 13, 1987 memo from Richard Greenberg, MD
RE: Gina Baptist

cc: Howard Hoffman, MD
    Medical Staff Application File
    Harvey Kalin, MD

**THE PSYCHIATRIC INSTITUTE
OF WASHINGTON, D.C.**

4440 MacArthur Boulevard, N.W.
Washington, D.C. 20007
(202) 965-8200
TDD for the Hearing Impaired: 965-8483

Howard A. Hoffman, M.D., F.A.P.A.
President/Medical Director
Lawrence A. Brain, M.D.
Director of Child/Adolescent Services
Keina Kulczycki, R.N., M.S.N.
Assistant Administrator, Clinical Services
Donald F. Silver
Administrator

FILED

OCT 3 1990

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

October 26, 1988

PLAINTIFF'S
EXHIBIT
3
91-90-800

#3

Taiwo Okusami, M.D.
Group Health Association
Psychiatry Services
1005 21st Street, N.W.
Washington, D.C.   20036

Dear Dr. Okusami:

I am attaching my letter to you of September 12, 1988.  As you will see
in that letter, I specifically responded to your request for information
concerning your application.  Specifically, should you wish to have privileges
at The Psychiatric Institute you must start the procedure all over again,
submit another application, letters of reference, etc.

Sincerely,

Howard A. Roffman, M.D.
President/Medical Director

HAR/sms

Psychiatric Institutes of America
Part of the NME Specialty Hospital Group

Sept.6, 1988

Howard Hoffman,M.D.
Medical Director,
     and
Donald Silver,Esq.
Administrator,
Psychiatric Institute of Washington
4460 MacArthur Blvd., Washington D.C.

FILED

Dear Gentlemen:

On August 22,1988, I wrote a letter to Dr. Hoffman enq-
uiring about the status of my application. I am still awaiting
a reply.

According to the Byelaws, application for membership and
priviledges are acted upon by the Executive Committee.When the
committee's recommendation is adverse to the applicant's re-
quest, the Hospital Administrator is expected to notify the
applicant by certified mail. Since I have received no such notice
I must therefore assume my application is still being reviewed
or alternatively your organisation forgot to notify me that my
application has been approved.

I do not find any reference in the Byelaws that specifically
nullifies the application process because you revoked my temporary
priviledges: such revocation by the Medical Director or his designee
did not constitute action by the Executive Committee as required
by the Byelaws.

Gentlemen, I will appreciate the courtesy of an early reply to
this second request.

Sincerely

Taiwo Okusami, M.D.

Group Health Association
Psychiatry Services
1005 31st Street N.W.
Washington, DC 20036
202-478-1760

September 16, 1988

Howard A. Hoffman, M.D.
President/Medical Director
Psychiatric Institute
4460 MacArthur Blvd.
Washington, D.C 20007.

FILED
OCT 3 1990

Dear Dr. Hoffman :
        I appreciate your response in the letter dated Sept. 12, 1988.
It is clear, however, that you misunderstand my request which by the
way was clearly stated in another letter to you, dated Sept. 6, 1988.
I am NOT asking to reapply. I am only asking for the status of my
application, that according to the Byelaws is still in the appointment
process, since noone has written to inform me that the application has
been denied.

        I am aware that my temporary priviledges were withdrawn, however
that does not conclude the application process. Again, as I stated in
my last letter, the Byelaws specifically provides for the review of
applications by the Executive Committee and the Medical Staff. Only these
two bodies are empowered by the Byelaws to give recommendations on the
applicant's request( Byelaws pg 7, Appointment Process ). The withdrawal
of temporary priviledges do not constitute denial of application by the
bodies empowered in the Byelaws.

        I look forward to a reply to my request.

                                        Sincerely,

                                        Taiwo   Okusami, M.D.

P.B. Attached is a copy of the Byelaws pg 7 ref. above.

#6

PLAINTIFF'S
EXHIBIT
6
CA 90-800

April 24, 1989.

Mr. Al Smith
Administrator
Psychiatric Institute of Washington
4460, MacArthur Boulevard
Washington, D.C. 20007.

FILED

OCT ? 1990

Dear Mr. Smith:

The provision attached to the recommendation of the Executive Committee as contained in your of letter of April 18, 1989(received April 21, 1989) tantamounts to probationary condition (Article V, Section 11b of the Bylaws) and it is an adverse action by the Executive Committee. I am, therefore, requesting a Fair Hearing pursuant to Appendix II, articles 1.1(a) and 1.2(a).

It is apparent that the Executive Committee based its conclusion on the case reviews made by the Patient Care Evaluation Committee(PCEC),apeer review body, and I was never afforded the oppotunity to defend myself against the questions raised by that body. The American Psychiatric Association, the American Medical Association and the Joint Commission on Accreditation for Hospitals have guidelines that govern peer review process. The Psychiatric Institute Medical Staff Bylaws are written with the guidelines of these bodies. The Executive Committee in violating the principles for the guidelines to peer review has acted with malice as the members of the commit are pschiatrists with un disputed familiarity with the peer raview process. The Committee, unfortunately, perpetuated the same damage to my proffesional reputation that the Medical Director and his designee started. I find it very difficult to understan why my application submitted sometime in February, 1987 has taken over 2 years to pr cess when the letter written to me dated August 14, 1987 clearly stated that the Exe cutive Committee was in the process of reviewing my application. The Medical Directo and members fo the Executive clearly seem to think thet can violate the Bylaws and the standard of practice in the Pschiatric Community and thereby damage my reputatio with impunity.

In requesting for Fair Hearing, I expect to have access to documents in my appli cationfiles, the review notes on all the cases presented to the PCEC and the medical records the reviewers examined.

- 7 -

3. A copy of the applicant's malpractice insurance certificate.
4. Two peer recommendations.
5. Two psychological testing summaries (for psychologists requesting privileges in psychological testing).
6. Good standing in a residency program as evidenced by the Director of the program (Associate category).
7. Evaluations completed by two (2) current supervisors (Associate category).

This application shall be submitted to the Hospital Administrator who shall transmit the completed application to the Executive Committee for evaluation.

h. Medical staff members who have not admitted patients for over one (1) year shall be required to submit a new completed application.

## Section II:   Appointment Process

a. Within one month of the receipt of the completed application for appointment, the Executive Committee shall examine the evidence of character, professional competence, qualifications and ethical standing of the practitioner and shall determine, through information contained in references given by the practitioner and from other sources available to the Committee including an appraisal from the clinical service for which privileges are sought, whether the practitioner has established and meets all of the necessary qualifications for the category of staff appointment and the clinical privileges requested by him.

b. Upon completion of its review of the application and related material, the Executive Committee shall make a written report of its investigation to the Medical Staff including the recommendation as to whether the practitioner be appointed to the Medical Staff, that he be rejected for Medical Staff appointment, or that his application be deferred for further consideration. All recommendations to appoint must also specifically recommend the clinical privileges to be granted which may, where appropriate, be qualified by probationary conditions. Together with its report, the Executive Committee shall transmit to the Medical Staff the completed application and all other documentation considered in arriving at its recommendation.

c. The Medical Staff shall review the recommendations of the Executive Committee and all supporting documentation.

d. When the recommendation of the Executive Committee and the Medical Staff is favorable to the practitioner, the Hospital Administrator shall forward it together with all supporting documentation to the Governing Body for consideration at its next scheduled meeting.

e. When the recommendation to the Executive Committee is adverse to the practitioner either in respect to appointment or in the granting of clinical privileges, the Hospital Administrator shall promptly so notify the practitioner by certified mail, return receipt requested. No such

Appendix II

FAIR HEARING PLAN F I L E D

PLAINTIFF'S
EXHIBIT
8
CV-90-800

Hearing Plan

**DEFINITIONS**

' r  199'

The following definitions shall apply to the provisions of this Fair Hearing Plan.

1.  APPELLATE REVIEW BODY means the group designated pursuant to Section 5.4 of this Plan to hear a request for appellate review properly filed and pursued by a practitioner.

2.  EXECUTIVE COMMITTEE means the Executive Committee of the Medical Staff.

3.  HEARING COMMITTEE means the committee appointed pursuant to Section 2.3 of this Plan to hear a request for an evidentiary hearing properly filed and pursued by a practitioner.

4.  PARTIES means the practitioner who requested the hearing or appellate review and the body upon whose adverse action a hearing or appellate review request is predicated.

5.  SPECIAL NOTICE means written notification sent by certified or registered mail, return receipt requested.

6.  DAYS for purposes of this Fair Hearing Plan shall means working days, which are considered to be Monday through Friday between the hours of hours of 9:00 A.M. and 5:00 P.M.  .

**ARTICLE I:  INITIATION OF HEARING**

1.1  RECOMMENDATIONS OF ACTIONS

The following recommendations or actions shall, if deemed adverse pursuant to Section 1.2, entitle the practitioner affected thereby to a hearing:

(a)  Denial of initial staff appointment
(b)  Denial of reappointment
(c)  Suspension of staff membership
(d)  Revocation of staff membership
(e)  Denial of requested advancement of staff category
(f)  Reduction in staff category
(g)  Limitation of admitting prerogatives
(h)  Denial of requested service affiliation
(i)  Denial of requested clinical privileges
(j)  Reduction in clinical privileges
(k)  Suspension of clinical privileges
(l)  Revocation of clinical privileges
(m)  Terms of probation
(n)  Requirement of consultation

## 1.2  WHEN DEEMED ADVERSE

A recommendation or action listed in Section 1.1 shall be deemed an adverse action only when it has been:

(a)  Recommended by the Executive Committee; or

(b)  Taken by the Governing Body contrary to a favorable recommendation by the Executive Committee under circumstances where no right to hearing existed; or

(c)  Taken by the Governing Body on its own initiative without benefit of a prior recommendation by the Executive Committee.

## 1.3  NOTICE OF ADVERSE RECOMMENDATION OR ACTION

A practitioner against whom adverse action has been taken pursuant to Section 1.2 shall promptly be given special notice of such action. Notification shall specify that practitioner has three days following the date of receipt of notice within which a request for a hearing must be submitted.  The practitioner shall also be informed that upon receipt of his request for a hearing, he will be notified of the date, time and place of the hearing and the grounds upon which the adverse action is based.

## 1.4  REQUEST FOR HEARING

A practitioner shall have three days following his receipt of a notice pursuant to Section 1.3 to file a written request for a hearing.  Such request shall be delivered to the Hospital Administrator either in person or by certified or registered mail.

## 1.5  WAIVER BY FAILURE TO REQUEST A HEARING

A practitioner who fails to request a hearing within the time and in the manner specified in Section 1.4 waives any right to such hearing and to any appellate review to which he might otherwise have been entitled. Such waiver in connection with:

(a)  An adverse action by the Governing Body shall constitute acceptance of that action, which shall thereupon become and remain effective pending the final decision of the Governing Body.

(b)  An adverse recommendation by the Executive Committee shall constitute acceptance of that recommendation, which shall thereupon become and remain effective pending the final decision of the Governing Body.  The Governing Body shall consider the Committee's recommendation at its next regular meeting following waiver.  In its deliberations, the Governing Body shall review all the information and material considered by the Committee and may consider all other relevant information received from any source.  If the Governing Body's action on the matter is in accord with the Executive Committee's recommendation, such action shall constitute the final

4460 MacArthur Boulevard, N.W.
Washington, DC 20007
(202) 965 8200
100 to the Hearing Impaired 965 4463

FILED

'1, F 3   190~

April 18, 1989

Howard A. Hoffman, M D, FAPA.
President/Medical Director
Leonardo A. Gosin, M.D.
Director of Child/Adolescent Services
Diana Refizgold, R.N., M S N
Assistant Administrator - Clinical Services
Al G. Smith
Administrator

PLAINTIFF'S
EXHIBIT
9
#9

Taivo Okusami, M.D.
1005 21st Street, N.W.
Washington, DC  20036

Dear Dr. Okusami:

The Executive Committee of the Medical Staff recommended approval of your request for privileges at its meeting on April 5, 1989. This recommendation will be forwarded to the Board of Directors for final approval at its June 13, 1989 meeting. Following the meeting, I will formally notify you of the Board's decision.

Upon final approval of your request for privileges, you will be appointed to the Medical Staff for a provisional period. During this time each of your cases will be closely reviewed by members of our Patient Care Evaluation Committee. You will receive comments from the Committee and may be asked to provide a response to any of the Committee's questions or concerns.

Please feel free to contact me if you have any questions regarding the status of your privileges.

Sincerely,

Al Smith
Administrator

Psychiatric Institutes of America
part of the NME Specialty Hospital Group

PLAINTIFF'S EXHIBIT
#10
FILED

December 5, 1988

To Whom It May Concern:

I applied to Psychiatric Institute of Washington for membership and admitting priviledges in February 1987. In August 1987 while under temporary priviledges P.I.W. reviewed my cases and claimed some concern about my patient care. They however denied me opportunity to respond to such concerns through the appropriate peer review, but instead decided to place me under medical supervision. I rejected medical supervision because I was never given such opportunity and more importantly because I was confident their concerns were groundless and could be proven by the medical records. Psychiatric Institute of Washington therefore revolked my temporary priviledges. I have since started a legal procedure to challenge P.I.W.'s action.

Taiwo Okusami, M.D.
Staff Psychiatrist

TO/pkb

WASHINGTON
UNIVERSITY
HOSPITAL

901 23rd Street, N.W., Washington, D.C. 20037

**MEDICAL AND DENTAL S** =F

CATEGORY OF PRACTICE (CHECK ONE)
☑ MEDICINE ☐ DENTISTRY ☐ OSTEOPATHY

### PERSONAL DATA

**NAME IN FULL (Last, First, Middle)**  OKUSAMI   TAIWO    **DATE**

**OFFICE ADDRESS (Primary)** 1005, 21st ST. NW
WASH. DC   ZIP 20036

**OFFICE ADDRESS (Secondary)**   ZIP

**OFFICE TELEPHONE NO.** 202)828-7762   **ANS. SERVICE TELEPHONE NO.**   **OFFICE TELEPHONE NO.**   **ANS. SERVICE TELEPHONE NO.**

**RESIDENCE ADDRESS** 9, BITTERROOT CT, ROCKVILLE   MD   20853

**RESIDENCE TELEPHONE NO.** ▶ (301) 929-1772   **SOCIAL SECURITY NUMBER** ▶ 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

**SEX** ▶ M   **BIRTHPLACE (City, State)** LAGOS, NIGERIA   **BIRTH DATE** 3-15-47   **CITIZENSHIP** NIGERIA

**PREMEDICAL EDUCATION**

**COLLEGE OR UNIVERSITY** ▶   **DEGREE** ▶   **LOCATION** ▶   **DATE OF GRADUATION** ▶

**MEDICAL EDUCATION SCHOOL** ▶ UNIVERSITY OF IBADAN NIGERIA   **DEGREE** ▶ MB.BS   **LOCATION** ▶ NIGERIA   **DATE OF GRADUATION** ▶ 6-73

| POST-GRADUATE TRAINING (Internship, Residency, Fellowship) | INSTITUTION | DEGREE/NATURE OF TRAINING | CITY/STATE | DATES |
|---|---|---|---|---|
| | General Hospital, Lagos | Internship - Rotating | Lagos, Nigeria | 7/74-6/75 |
| | Medcol Inst of VA - Residency 1st Yr | Richmond, VA | 7/76-6/77 |
| | No. Va. Mental Health Inst Residency 2nd Yr | Falls Ch - VA | 7/77-6/78 |
| | Children's Hosp. Fellowship | Wash. DC | 7/78-6/80 |

| TEACHING APPOINTMENTS (Past & Present) | TITLE | INSTITUTION | SPECIALTY | DATES |
|---|---|---|---|---|
| | Howard University - Dept of Psychiatry | Child Psyc. | 7/80-4/82 |

| MEMBERSHIP ON OTHER HOSPITAL MEDICAL STAFFS (Past & Present) | INSTITUTION | | CITY/STATE | DATES |
|---|---|---|---|---|
| | Wash. Adventist Hospital | | Takoma Park, MD | '85 - Present |
| | Psych Inst of Wash. | | DC | 82-83; 87 |
| | Wash. Hosp. Center | | DC | 86 - 88 |

| ARE YOU BOARD CERTIFIED? | ☑ YES ① ② ☐ NO | NAME OF BOARD ABPN ABPN | DATE OF CERTIFICATION ① Nov 1781 ② 1984 | CERTIFICATE NO. 22561/185 |
|---|---|---|---|---|
| | | APPLICATION PENDING ☐ YES ☐ NO ▶ | SPECIALTY | DATE SUBMITTED |

**DO YOU HAVE A D.C. MEDICAID PROVIDER NUMBER?** ▶ ☐ YES ☑ NO   PLEASE LIST NUMBER

### UNIVERSITY POLICY ON EQUAL OPPORTUNITY

George Washington University does not discriminate against any person on the basis of sex, race, color, religion, national origin, or handicap in any of its education or employment programs or activities. Federal regulations implementing Title IX of the Education Amendments of 1972 and Section 504 of the Rehabilitation Act of 1973 call for an explicit statement that the requirement not to discriminate on the basis of sex or handicap extends to employment in and admission to such programs and activities.

Inquiries concerning the application of this policy and federal laws and regulations concerning discrimination in education or employment programs and activities may be addressed to Marianne Phelps, Assistant Provost for Affirmative Action, Rice Hall, Washington, D.C. 20052, or to the Director of the Office for Civil Rights of the Department of Health and Human Services.

GWH (Rev.) (4-86)

## LICENSURE

| STATE OR PROVINCE | DATE ISSUED | LICENSE OR REGISTRY NO. | RENEWAL NO. | DATE |
|---|---|---|---|---|
| DISTRICT OF COLUMBIA | 3/12/79 | 11520 | | |
| | | | | |
| | | | | |

A COPY OF YOUR MOST RECENT LICENSE TO PRACTICE IN THE DISTRICT OF COLUMBIA MUST BE ATTACHED.

## PROFESSIONAL LIABILITY INSURANCE

| INSURED BY | LOCAL AGENT | ADDRESS |
|---|---|---|
| ST PAUL FIRE & MARINE | LIMA COMP | |

| POLICY NO. | AMOUNT OF COVERAGE | POLICY EXPIRATION DATE | TYPE |
|---|---|---|---|
| 508JC4982 | 5,000,000/5,000,000 | 1/31/89 | ☐ OCCURRENCE  ☒ CLAIMS MADE * |

* IF COVERAGE IS CLAIMS MADE, A COPY OF A "DEATH, DISABILITY OR RETIREMENT EXTENDED REPORTING PERIOD ENDORSEMENT" OR AN "EXTENDED REPORTING PERIOD ENDORSEMENT," MUST BE ATTACHED TO THIS APPLICATION.

A COPY OF YOUR CERTIFICATE OF INSURANCE MUST BE ATTACHED TO THIS APPLICATION OR BE FORWARDED TO THE MEDICAL DIRECTOR PRIOR TO CONSIDERATION OF THIS APPLICATION BY THE MEDICAL AND DENTAL STAFF.

## STATEMENT OF HEALTH

EACH APPLICANT MUST CHECK ONE OF THE FOLLOWING:

1. ☒ I CERTIFY THAT I AM IN GOOD HEALTH AND HAVE NO PHYSICAL OR MENTAL LIMITATION.

2. ☐ I DO HAVE CHRONIC ILLNESS, PHYSICAL DISABILITY AND/OR MENTAL LIMITATION TO MY HEALTH, WHICH MAY INCLUDE ALCOHOL OR DRUG USE, BUT BELIEVE THAT THIS DOES NOT SIGNIFICANTLY IMPAIR MY ABILITY TO RENDER QUALITY PATIENT CARE. *

* IF YOU ANSWERED #2 ABOVE, AND THERE HAS BEEN ANY SIGNIFICANT CHANGE IN YOUR HEALTH STATUS IN THE PAST 8 YEARS, A FULL STATEMENT OF EXPLANATION MUST BE ATTACHED. THIS MUST INCLUDE THE NAME AND ADDRESS OF YOUR PHYSICIAN.

## PROFESSIONAL STATUS

EACH APPLICANT MUST ANSWER ALL OF THE FOLLOWING QUESTIONS:

Within the Past 8 Years

1. HAS YOUR LICENSE TO PRACTICE MEDICINE BEEN VOLUNTARILY OR INVOLUNTARILY LIMITED, SUSPENDED, REVOKED OR RESTRICTED? ☐ YES ☒ NO

2. HAS YOUR LICENSE TO PRESCRIBE NARCOTICS BEEN VOLUNTARILY OR INVOLUNTARILY REFUSED, SUSPENDED OR REVOKED? ☐ YES ☒ NO

3. HAVE YOU RELINQUISHED OR REDUCED YOUR PRIVILEGES AT ANY HOSPITAL OR DROPPED ANY HOSPITAL FROM YOUR PRACTICE? ☒ YES ☐ NO

4. HAVE YOU EVER BEEN DENIED REQUESTS FOR HOSPITAL PRIVILEGES AT ANY HOSPITAL? ☒ YES ☐ NO

5. HAVE YOU EVER RESIGNED OR BEEN ASKED TO RESIGN FROM A MEDICAL STAFF OR A PROFESSIONAL SOCIETY? ☐ YES ☒ NO

6. HAS ANY HOSPITAL EVER SUSPENDED, DIMINISHED, REVOKED, OR FAILED TO RENEW YOUR PRIVILEGES? ☒ YES ☐ NO

7. HAVE YOU EVER BEEN CONVICTED OF A CRIME (OTHER THAN A MOTOR VEHICLE CITATION)? ☐ YES ☒ NO

8. HAVE YOU EVER BEEN DENIED MEMBERSHIP OR RENEWAL THEREOF, OR BEEN SUBJECT TO DISCIPLINARY PROCEEDINGS IN ANY MEDICAL ORGANIZATIONS? ☐ YES ☒ NO

9. HAVE YOU EVER HAD PROFESSIONAL LIABILITY INSURANCE DENIED, CANCELLED, ISSUED ON SPECIAL TERMS OR RENEWAL REFUSED? ☐ YES ☒ NO

IF YOU HAVE ANSWERED "YES" TO ANY OF THE ABOVE QUESTIONS, A FULL STATEMENT OF EXPLANATION MUST BE ATTACHED.

10. HAVE YOU BEEN THE SUBJECT OF A MALPRACTICE CLAIM OR A DEFENDANT IN A MALPRACTICE SUIT IN THE PAST 8 YEARS? ☐ YES ☒ NO

IF YOU ANSWERED YES TO THIS QUESTION, PLEASE PROVIDE THE FOLLOWING INFORMATION FOR EACH CLAIM OR SUIT:

A. NATURE OF ALLEGATION:

B. WAS A SUIT FILED? ☐ YES ☐ NO   IF YES, STATE WHEN (MONTH/YEAR) _____

C. DISPOSITION OR CURRENT STATUS OF CLAIM OR SUIT:   ☐ OPEN   ☐ CLOSED   ☐ SUIT WITHDRAWN

WAS THE DISPOSITION IN FAVOR OF YOU OR THE PLAINTIFF? _____

IF PAYMENT WAS MADE, INDICATE AMOUNT OF PAYMENT. _____

WAS PAYMENT A SETTLEMENT OR AN AWARD? _____

D. NARRATIVE DESCRIPTION OF THE MEDICAL FACTS (MUST INCLUDE BUT NOT BE LIMITED TO THE TYPE OF TREATMENT AND/OR SURGERY, YOUR INVOLVEMENT, I.E., CONSULTANT, PRIMARY SURGEON, ETC.) A FULL STATEMENT OF EXPLANATION MUST BE ATTACHED.

Group Health Association
Psychiatry Services
1005 21st Street NW
Washington, DC 20036
202 828 7750

FILED

August 20, 1989

Board of Physician Quality Assurance
Department of Health & Mental Hygiene
Baltimore, Md.  21203-3106

Dear Sir/Madam:

In 1987 I submitted an application for priviledges to Psychiatric Institute of Washington, D.C.  I was granted temporary priviledges pending review of my application.

As an employee of Group Health Association, I share responsibility for hospital care of patients with my colleagues.  On July 1st,1987 I took over such care.  Such responsibility was primarily to treat patients who needed acute in-patient care and return them to my Health Maintenance Organization out-patient services as reasonably as possible.

On August 13, 1987 the administrators of Psychiatric Institute notified me to be present at the meeting on August 14,1987.  At that meeting I was summarily told that the reviewers of some of my cases raised concern about my care of patients and I was summarily told to accept supervision or have my temporary priviledges revoked.  I pointed out that the Bylaws and standards of peer review require that I should be allowed due process in cases such as this and that I could not accept supervision unless I was granted the opportunity to review the reports and respond to them appropriately.  The administrators refused my request and revoked my privileges.

However, in April 1989 Psychiatric Institute completed review of the same application I had submitted in 1987, and for which I was granted temporary priviledges and granted me full priviledges and membership. I had contended all along that Psychiatric Institute had no basis to revoke my priviledges and that sole purpose for violating due process of peer review was to place me under supervision so its officers could control the services I provided purely for economic reasons.

My practice as a member of an HMO is short-term focussed and it was contrary to the typical longer stay of generally practiced by non-HMO psychiatrist. Psychiatric Institute, should be noted, is a for-profit institution.

Sincerely,

Taiwo Okusami, M.D.
Staff Psychiatrist

Administrative Offices
4301 Connecticut Ave  NW
Washington DC
20008
202 364-2000

APPLICATION FOR RENEWAL OF  **REGISTRATION**

MARYLAND STATE BOARD OF **PHYSICIAN QUALITY ASSURANCE**

PLEASE MAKE CHECK PAYABLE TO THE BOARD.

FAILURE TO RENEW LICENSE BY      09/30/89

COULD RESULT IN    EXPIRATION OF LICENSE

CONTINUING EDUCATION.    YOU   ARE    REQUIRED BY LAW TO

PARTICIPATE IN APPROVED CONTINUING EDUCATION PROGRAMS BEFORE YOUR

RENEWAL REGISTRATION  CAN BE ISSUED HOURS REQUIRED:  100

YOU HAVE   NO    HOURS ON RECORD FOR THIS RENEWAL PERIOD.

RETURN BY  08/25/89    NO LICENSE ISSUED BEFORE   09/22/89

ORIGINAL REGISTRATION #D29827 RENEWAL FEE 90.00 EXP. DATE 09/30/89
OKU

TAIKO OKUSAMI

1005 21ST STREET

WASHINGTON        DC    20036

COMPLETE ONLY IF NAME HAS CHANGED. PLEASE PRINT

LAST NAME AND GENERATIONAL INDICATOR (JR., III., etc.)

FIRST NAME AND MIDDLE NAME/INITIAL

COMPLETE ONLY IF ADDRESS HAS CHANGED. PLEASE PRINT.

ADDRESS

CITY

STATE    ZIP CODE

FOREIGN COUNTRY

THIS SECTION MUST BE COMPLETED FOR YOUR RENEWAL TO BE ISSUED

THIS SECTION MUST BE COMPLETED FOR YOUR RENEWAL TO BE ISSUED

The Health Occupations Article § 1-307 requires that you verify that you are complying with the Workmen's Compensation Law for your renewal to be issued.

I hereby certify one of the following:

(a) ☐ I am not practice in Maryland.

(b) ☐ I do not employ anyone in my practice in Maryland.

(c) ☒ I employ one or more persons in my Maryland practice and have the following Workmen's Compensation coverage.

PLEASE COMPLETE REVERSE SIDE

(as applicable to nursing home administrators)